528 So.2d 602 (1988)
Ambrose DOUZART, Individually and as Administrator of the Estate of the Minor Child, Andranita D. Douzart, Plaintiff-Appellant,
v.
Dr. Emily JONES, et al., Defendants-Appellees.
No. 19552-CA.
Court of Appeal of Louisiana, Second Circuit.
May 4, 1988.
Donald R. Miller, Shreveport, for plaintiff-appellant.
*603 Mayer, Smith & Roberts by Caldwell Roberts, Shreveport, for defendants-appellees.
Before MARVIN, FRED W. JONES, Jr. and NORRIS, JJ.
MARVIN, Judge.
In this medical malpractice action for damages to a child injured at birth, the parents appeal a judgment based on a jury verdict rejecting their demands.
The issues concern the credibility of the mother of the child and whether the defendant doctor breached the standard of care. We find no manifest or clear error and affirm. Virgil v. American Guar. & Liability Ins., 507 So.2d 825 (La.1987).

STANDARD OF CARE; BURDEN OF PROOF
In a medical malpractice action against a physician-specialist, the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians within the involved medical specialty and is not restricted to proof of the standards of care and skill within the defendant's community or locality. LRS 9:2794A(1); Ardoin v. Hartford Acc. & Indem. Co., 360 So.2d 1331 (La.1978).
The plaintiff must also prove that the defendant either lacked the expected degree of knowledge and skill or failed to use reasonable care and diligence and his or her best professional judgment, in the particular application of that skill in the undertaking. Plaintiff must prove, as well, that the injury complained of was the proximate result of the defendant's breach of the professional duty. LRS 9:2794A(2), (3).
The doctor's conduct is evaluated in terms of reasonableness under the circumstances existing when the professional judgment is exercised. Neither a general practitioner nor a specialist is held to a standard of perfection or evaluated with the benefit of hindsight. See and compare Matthews v. La. State Univ. Medical Center, 467 So.2d 1238 (La.App. 2d Cir.1985).

FACTS
The delivery of this infant in January 1981 was complicated by shoulder dystocia which is caused when one shoulder of the infant becomes trapped behind the mother's pelvis during delivery or exit of the infant's head. If the shoulder is not quickly dislodged by maneuvering the infant or enlarging the delivery canal, breathing becomes increasingly impaired and death by suffocation is threatened.
When shoulder dystocia occurs, the doctor should make a maximum incision on the back wall of vagina to enlarge the space to accommodate the child as much as possible, after which an attempt is made to rotate the baby or reposition its arms to facilitate delivery. If these methods do not succeed, an attempt is made to manually fracture the collar bone of the child to reduce the diameter of the shoulders. As a last resort, the doctor manually attempts to force the child out of the predicament by pulling on her head.
Defendant Dr. Jones testified that she attempted each maneuver before succeeding on the final maneuver.[1] Bruises on the child's shoulder corroborated Dr. Jones's unsuccessful attempt to break the collar bone. Fortunately the child did not advance into acute respiratory distress before or after her birth.
Dr. Jones acknowledges that the pressure she applied in her successful attempt to force delivery caused damage to the nerves in the brachial plexus. This nerve damage produces Erb's palsy in the arm, a condition that causes weakness and not paralysis. The infant's condition was diagnosed as a mild Erb's palsy and causes the child to be able to extend her right arm to only 85 percent of its capacity. Dr. Jones also acknowledges that if she had delivered the child by Cesarean section shoulder dystocia would have been avoided, but replaced by known surgical risks to both the mother and the child.
Plaintiffs contend Dr. Jones should have anticipated that shoulder dystocia might occur and should have done a C-section at the outset because she knew of Mrs. Douzart's *604 excessive weight gain during the pregnancy; she knew the baby was large; and she knew or should have known that shoulder dystocia and a similar birth injury had occurred when Mrs. Douzart delivered another large baby several years earlier, while under the care of a different doctor.
Plaintiffs have two other daughters who are twelve and five years older than the third. The first weighed 8 lbs. 12 oz. at birth and was delivered without complications. The delivery of the second, who weighed 10 lbs. 11 oz. at birth, was also complicated by shoulder dystocia. The second daughter has Erb's palsy in her left arm. The third child, delivered by defendant Dr. Jones in January 1981, weighed 10 lbs. 15½ oz. at birth and has Erb's palsy in her right arm because of the nerve injury at birth. This condition prevents her from fully extending her arm or straightening her elbow but does not impair any motor functions of her arm or hand.
Mrs. Douzart first saw Dr. Jones in July 1980, when she was about three months into the third pregnancy. According to the doctor's records, Mrs. Douzart reported that her last baby weighed over 10 pounds. Doctors consider a baby "large" if it weighs over 8½ to 9 pounds at birth. Dr. Jones knew Mrs. Douzart was carrying another large child but felt she could have a normal delivery because her pelvis was large and she had previously delivered a "large" baby.
Dr. Jones said the only prior delivery difficulty Mrs. Douzart reported to her was long labor. Dr. Jones said that Mrs. Douzart did not tell her about the prior difficult delivery or the other child's palsy, and that they discussed a C-section only for the purpose of avoiding long labor. Dr. Jones explained to Mrs. Douzart that a C-section would cause pain after delivery instead of before, as in normal childbirth.
The hospital records contain three forms signed by Mrs. Douzart. One is a release of responsibility for valuables. Another authorizes Dr. Jones to perform "Obstetrical Delivery and such additional operations or procedures as are considered therapeutically necessary on the basis of findings during the course of said operation." The third form, entitled "Medical History," asked about "Children. Number and Health." Mrs. Douzart wrote "2Health good."
The size or width of the baby's shoulders cannot be accurately measured during pregnancy. One factor which should alert the doctor that shoulder dystocia may occur is a long second stage of labor, from complete cervical dilation to delivery. Mrs. Douzart's second stage of labor was "short," lasting only 14 minutes. The first stage of labor, from onset to completion of cervical dilation, lasted about 10 hours, and was not considered unduly long.
Mrs. Douzart, in her late thirties, was 5' 6" tall. She gained about 45 pounds during this pregnancy, near the end of which she weighed over 190 pounds. Experts consider that this much weight gain is excessive. According to Dr. Jones's records, she placed Mrs. Douzart on a 1,000 calorie diet in about the fourth month of pregnancy and admonished her about gaining too much weight on two visits in the seventh month.
Dr. Jones testified that the risk of shoulder dystocia in a large mother with a prior large baby is about one percent, increasing to two percent if the mother has had a previous delivery complicated by shoulder dystocia. Dr. Stone, the medical review panel member not selected by either litigant who was called as plaintiffs' witness, testified that if shoulder dystocia occurs during one delivery, the odds of it recurring in the next delivery would be "one in a hundred maybe on a large baby, and maybe as high as one in seven or eight on a very large baby." He was not asked to define "very large."
Dr. Stone opined that Mrs. Douzart's prior delivery of a large baby was "proof of an adequate pelvis" and said even though she was obese and had had large babies before, he would have given her a "good trial of labor" before deciding whether to perform a C-section. That decision would be made on her progress during labor because shoulder dystocia is more likely after a long second stage of labor than after a short second stage. Dr. Stone said Mrs. Douzart's labor "progressed very well, and *605 you could assume from the progress of the labor and the short second stage that you would not expect to have shoulder dystocia."
Dr. Stone testified he and the other review panel members determined Dr. Jones did not know all the evidence about the birth of the second child. He was asked to assume, as Mrs. Douzart claimed, that Dr. Jones knew about the problems with the second child and that Mrs. Douzart expressed a preference for a C-section but left the ultimate decision to the doctor's best judgment. Dr. Stone said the failure to perform a C-section under these facts would not fall below the standard of care for an obstetrician because the chances of having shoulder dystocia occur are remote even if it has occurred in a prior delivery, and the progress of Mrs. Douzart's labor gave Dr. Jones no warning that shoulder dystocia may occur. Compare factually Jackson v. Huang, 514 So.2d 727 (La.App. 2d Cir.1987), writ denied.
Plaintiffs' expert, Dr. Arthur Lester, said he would not have recommended a C-section solely upon the prior shoulder dystocia because of the "comparative dangers" presented by vaginal delivery and by C-section. The former presents the risk of shoulder dystocia but the latter is major surgery with the risk of infection, bleeding, blood clots, or death for the mother. Dr. Jones explained that babies delivered by C-section are more likely to have respiratory problems or to die than are babies delivered vaginally.
Dr. Lester testified that Dr. Jones would have fallen below the standard of care only if she put as much pressure on the baby's head as she did before she tried other maneuvers to extract the shoulders. If she tried the other methods which did not prove successful, Dr. Lester said, "there was nothing else she could do" because the alternative to nerve damage is the baby's death.
The deposition of the late Dr. Floyd Peninger, the obstetrician who delivered Mrs. Douzart's second child with shoulder dystocia, was introduced into evidence. He would have suggested a C-section for the third delivery if he felt the baby weighed over 10 pounds but admitted he would be "more prejudiced than anybody else because it is a frightful thing to get a baby's head out and you can't get the rest of the baby out. You know you've got a few minutes to get that baby out. And, you sweatthat influences your judgment sometimes." He would not have recommended a C-section for the third delivery if he had not delivered the second child and did not know of her birth injury but knew the weight of the first two children.
Mrs. Douzart testified that she told Dr. Jones who delivered her second child and asked her to consult with Dr. Peninger. Dr. Jones knew and respected Dr. Peninger but denied that Mrs. Douzart told her who delivered her second child.
Even if the jury believed Mrs. Douzart's testimony, the jury also heard her say that she agreed to let Dr. Jones decide whether to perform a C-section based on the course of labor. The expert witnesses agreed that the progress of Mrs. Douzart's labor gave no warning that shoulder dystocia may occur, and that a C-section cannot be done once shoulder dystocia occurs because the position of the baby's head precludes a C-section. The experts also agreed that it was not improper for Dr. Jones to decide against performing a C-section at the outset, even if she knew about the prior birth complications, because the chances of recurring shoulder dystocia are remote and Cesarean deliveries present serious risks for the mother and the baby. According to Dr. Stone, the fact that the child suffered nerve damage does not mean that Dr. Jones deviated from the standard of care.
The jury heard ample evidence to support its implicit finding that Dr. Jones acted reasonably and with the degree of skill and care expected of an obstetrician when she delivered plaintiffs' child.
Although the hospital records of the child show a diagnosis of mild right Erb's palsy, Mrs. Douzart's hospital records do not show that the delivery was complicated by shoulder dystocia or mention the maneuvers Dr. Jones tried to extract the shoulders. Dr. Stone, the review panel member, testified such record deficiencies had nothing to do with the child's nerve injury.
*606 Plaintiffs contend the hospital nurse gave Mrs. Douzart the drug Pitocin during labor without a written doctor's order. Both the nurse and Dr. Jones testified that the order was given verbally.
Plaintiffs also contend Dr. Jones should have used a fetal heart monitor in the hospital. There were no signs of fetal distress when the nurse monitored the fetal heart tones during labor, or in the baby's condition after her birth. Dr. Jones and Dr. Stone testified that fetal monitors, when used, are used before but not during delivery. Dr. Stone opined that the failure to use a fetal monitor had nothing to do with the child's injury.

CONCLUSIONDECREE
The jury obviously believed Dr. Jones and the experts and assigned little or no credence to the assertions of Mrs. Douzart that she repeatedly told Dr. Jones about shoulder dystocia in the second birth and that she desired a C-section. The record supports the judgment.
As to each allegation of malpractice, the evidence shows either no substandard conduct or no causal connection between the doctor's conduct and the child's injury. Plaintiffs did not meet their burden of proof under LRS 9:2794. At plaintiffs' cost, the judgment is AFFIRMED.
NOTES
[1] The record does not indicate in what order the maneuvers, before the last, were done.