582 So.2d 1368 (1991)
Shirley Ann BROADWAY, Nee Miller, et vir., Plaintiffs,
v.
ST. PAUL INSURANCE COMPANY, et al., Defendants.
No. 22433-CA.
Court of Appeal of Louisiana, Second Circuit.
June 19, 1991.
*1369 Donald R. Miller, Shreveport, for plaintiffs.
Mayer, Smith & Roberts by George T. Allen, Jr., Shreveport, for defendants.
Before MARVIN, SEXTON and HIGHTOWER, JJ.
HIGHTOWER, Judge.
In this medical malpractice action, Shirley Ann Broadway and her husband appeal from a judgment dismissing their claims *1370 against Dr. Frederick L. Price ("defendant") and his insurer. We affirm.

FACTS
On January 4, 1985, defendant, a general surgeon, performed a cholecystectomy (removal of the gallbladder) on Mrs. Broadway ("plaintiff"). During that operation, he somehow unknowingly injured or severed the common bile duct, the flexible tract or vessel through which bile flows from the liver to the duodenum. Unaware of the ductal damage, Dr. Price closed his patient and sent her to recovery after completion of the surgery. Mrs. Broadway generally fared well during her postoperative hospitalization, but large amounts of bile discharged from a drain placed in her side.[1]
While concerned about the excessive drainage, Dr. Price took no steps to determine its source, anticipating the complication would correct itself as had occurred with his other patients who experienced similar quantities of discharge. Instead of abating, however, the secretion initially increased. Eight days after surgery, defendant discharged Mrs. Broadway since she was ambulatory, afebrile (without fever), consuming a regular diet, and having brown stools.[2] Once home, the drainage tapered off. Indeed, during the second follow-up office visit on February 3, Dr. Price removed the drain, primarily basing his decision to do so upon information from plaintiff about the quantity of flow.
Mrs. Broadway returned to defendant's office on February 14, however, complaining of pain in the area of the incision. Promptly hospitalizing the patient, defendant ordered a CT scan which revealed an accumulation of fluid beneath the liver. He then decided in favor of an exploratory laparotomy to determine, if possible, the cause of the leakage and to establish drainage.
Dr. Price performed the surgery on February 15, 1985. Accessing the subhepatic space, he found a moderate sized bile abscess which he suctioned off. Nevertheless, even after closely studying the surgical field, he could not visually locate the source of the leakage. Additionally, as a result of inflammation caused by accumulated bile, the surrounding tissue had become friable, meaning it would likely tear if touched. Accordingly, he did not perform a cholangiogram[3] or dissect out the entire common bile duct for examination. Still unaware of the injury to the common bile duct and convinced, by his past experience, that the body would heal itself upon alleviation of the irritation, defendant installed two types of drains to achieve better drainage.
Following this second surgery, Mrs. Broadway again drained an excessive amount of bile.[4] Expecting the flow to subside and stop, as with previous patients, Dr. Price released her on February 21 to recuperate at home. Plaintiff, now having lost her confidence in defendant, only saw him for one follow-up visit on February 27.
Thereafter, on March 12, 1985, she sought treatment from another general surgeon, Dr. Wallace Brown. Based upon her history and the continuing drainage, he ordered an endoscopic retrograde cholangiopancreatomy (ERCP), a nonsurgical diagnostic procedure which injects dye into *1371 the biliary system to facilitate an X-ray examination for patency (the condition of being open or unobstructed). During two studies, performed more than 15 days apart, the test substance entered the common bile duct but could not be forced above the lower portions of the structure. According to subsequent reports, the colored matter did not fill beyond the approximate level of the cystic duct previously connected to the gallbladder.
After initially scheduling repair surgery, Dr. Brown cancelled the procedure upon concluding that the inflamed internal structures would not then tolerate the operation. Also, Mrs. Broadway's blood tests, all within normal limits, as well as other studies, demonstrated drainage of bile into the intestine. Thus, the body conceivably might heal itself, if given time. Accordingly, the doctor discharged his patient from the hospital, while recommending periodic followup visits.
In November 1985, plaintiff's recurring problems prompted corrective surgery. Upon entering the affected area, Dr. Brown found the proximal and distal ends of the common bile duct separated by a "very short distance." In reconnecting the two segments, he emplaced a T-tube, later removed after an uneventful recovery.
Initially, to a Medical Review Panel, the Broadways presented allegations against Dr. Price, Dr. E. Blaine Pittman, who assisted in the first two surgeries, and Schumpert Medical Center. Two of the three physicians on that tribunal, after examining the documentary evidence, found Dr. Price guilty of no malpractice.
Plaintiffs thereafter filed their present action, naming the two surgeons and their insurer (both physicians actually having the same carrier), in addition to the hospital, as defendants. Prior to trial, plaintiffs dismissed the suit against the medical facility. Later, at the conclusion of plaintiffs' case, the lower court granted a motion for directed verdict presented by Dr. Pittman. Subsequently, the jury decided in favor of the remaining defendants. After the lower court refused to grant judgment NOV, plaintiffs perfected this appeal challenging only the jury verdict.
It is here asserted that the trial judge erred in sustaining the jury verdict when the evidence demonstrated, according to plaintiffs, that Dr. Price breached the standard of care in (1) cutting the common bile duct; (2) failing to perform an ERCP in the face of excessive bile drainage and his knowledge that he had cut the common bile duct; (3) failing to advise, prior to the first surgery, of the risks of cutting the common bile duct; and (4) failing to later advise his patient of the availability of an ERCP to determine the patency of the common bile duct.

DISCUSSION
In a medical malpractice action against a physician or surgeon, the plaintiff has the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians... within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill, and
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
LSA-R.S. 9:2794(A).
The law does not, however, require absolute precision in medical diagnoses. Instead, the doctor's professional judgment and conduct are evaluated in terms of reasonableness under the then existing circumstances, not in terms of results or in *1372 the light of subsequent events. Stein v. Ins. Corp. of America, 566 So.2d 1114 (La. App. 2d Cir.1990), writ denied, 569 So.2d 984 (La. 1990); Douzart v. Jones, 528 So.2d 602 (La.App. 2d Cir.1988); Jackson v. Huang, 514 So.2d 727 (La.App. 2d Cir. 1987), writ denied, 518 So.2d 1050 and 519 So.2d 119 (La.1988).
The standard of knowledge, skill and care for physicians and surgeons is best determined from the testimony of other experts in the field. Stein, supra; Guillory v. Buller, 398 So.2d 43 (La.App. 3d Cir.1981). When there are contradictory expert opinions concerning compliance with the standard, the reviewing court will give great deference to the conclusions of the fact-trier. Appellate courts will not disturb such findings in the absence of clear error. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Stein, supra; Jackson, supra; Matthews v. La. St. Univ. Med. Center, 467 So.2d 1238 (La.App. 2d Cir.1985).

I.
Appellants first contend Dr. Price breached his duty of care by cutting the common bile duct. To assist with their burden of proving that fact, they seek benefit of the doctrine of res ipsa loquitur, which requires a defendant to exculpate himself from an inference of negligence. That concept, a rule of circumstantial evidence, applies when: the harm would not normally occur in the absence of negligence, there exists an absence of direct evidence to explain the activities leading to the injury, and the injury was caused by an agency or instrumentality within the actual or constructive control of the defendant. Galloway v. Ioppolo, 464 So.2d 386 (La. App. 1st Cir.1985); Sabella v. Baton Rouge General Hosp., 408 So.2d 382 (La. App. 1st Cir.1981). The rule is specifically applicable in cases involving unusual occurrences during the time of medical supervision. McCann v. Baton Rouge General Hosp., 276 So.2d 259 (La. 1973); Percle v. St. Paul Fire & Marine Ins. Co., 349 So.2d 1289 (La.App. 1st Cir.1977), writs denied, 350 So.2d 1218 (La.1977).
A total of six surgeons testified during the trial, including defendant and Dr. Pittman. All verified that severance of, or injury to, the common bile duct is a known risk of gallbladder surgery and can occur at the hands of the most skilled and competent surgeon, even in the absence of negligence. Such an incident is very rare, statistically occurring about once in every 300 to 400 gallbladder surgeries. In fact, only Dr. Brown admitted to having previously cut a common bile duct. Dr. Price acknowledged, on reflection, that he probably injured plaintiff's common bile duct with a blunt instrument used for dissection. However, none of the three physicians on the Medical Review Panel found defendant negligent in traumatizing the common bile duct.
Since insult to the common bile duct can occur without negligence, res ipsa loquitur is not applicable. Galloway, supra. Furthermore, the evidence preponderates that Dr. Price did not breach the standard of care owed to his patient when he inadvertently injured the common bile duct in some manner. Obviously then, the jury's finding is not clearly wrong in this respect.

II.
Plaintiffs next complain that Dr. Price's failure to perform an ERCP, in order to ascertain the cause of the copious bile discharge, amounted to negligence.
Dr. William Norwood, a member of the Medical Review Panel, shared this view. He further criticized Dr. Price for sending Mrs. Broadway home while she was still draining unacceptable amounts of bile. Dr. Norwood conceded, however, that after not discovering the injury during the initial surgery, the correct course of action would be to postpone the repair surgery, as Dr. Brown did, to allow time for the surrounding tissue to heal. Thus, Dr. Norwood did not fault defendant for failing to repair the common bile duct at the time of the second surgery, but only for declining to do additional testing during that hospitalization.
Dr. Wallace Brown also testified that he would not have discharged Mrs. Broadway while draining the amount of bile involved *1373 and with certain blood test results. Nonetheless, acknowledging that hindsight is better than foresight, he admitted that releasing Mrs. Broadway with follow-up office care constituted an acceptable option, considering that she had no fever, was not jaundiced, and had brown stools. As to the necessity of conducting a test, such as an ERCP, he suggested that would depend upon whether the physician felt strongly enough that the common bile duct had been injured.
In his defense, Dr. Price testified that he had never previously injured a common bile duct. He had, however, in several similar instances, observed copious discharge of bile which stopped after several weeks. As to those patients, the drainage originated from the gallbladder bed, or from loss of ligature at the cystic duct or at an accessory duct.
The evidence clearly shows that Dr. Price at no time had knowledge of the damaged vessel. In deciding to allow plaintiff to recuperate at home, he considered his experience with similar complications from other patients, together with the fact that Mrs. Broadway was ambulatory, afebrile, eating a normal diet, and having brown stools, the latter factor indicating the presence of bile in the digestive system. Moreover, the subsequent diminution of discharge tended to confirm, in his mind, that the common duct had not been the source of the bile.
Dr. Price acknowledged, in retrospect, that additional diagnostic tests should have been performed after the second surgery, but emphasized that based on his past experience he did not then believe the common bile duct had been injured. Furthermore, even had other studies occurred at that time, the course of the treatment would not have been different. That is to say, surgical intervention would have been delayed for several months to allow the body time to heal itself.
Drs. Charles Knight and Charles L. Black, the other members of the Medical Review Panel, both agreed with Dr. Price's assessment of his patient's condition. They further concluded that, by failing to order additional testing, he did not breach his duty of care. Dr. Knight recognized that an ERCP should be performed when the surgeon is alerted that the integrity of the common bile duct has possibly been compromised. Yet, he opined that numerous factors in Mrs. Broadway's case, specifically the absence of bile flow into the operative field during both surgeries, the continuation of brown stools, the lack of jaundice symptoms, and the later abatement of the drainage, all pointed toward more common complications.
Dr. Black testified that even Mrs. Broadway's abnormal blood test results did not mandate additional testing prior to her discharge from the hospital. Instead, because the patient consistently had normal colored stools and never jaundiced, he favored the "wait and see" approach utilized by Dr. Price. Dr. Black also stated that, during the time defendant treated Mrs. Broadway, none of her symptoms indicated a need for an ERCP. Further, even if such a test had been conducted during the second hospitalization, corrective surgery could not have occurred earlier than that performed by Dr. Brown.
As reflected by the record then, post-surgical care is a matter of clinical judgment exercised by the treating surgeon after evaluating all factors before him at the time. Although plaintiffs' experts testified they would have handled Mrs. Broadway's case differently with respect to additional testing, the jury concluded Dr. Price's conduct was reasonable in light of his assessment of the patient's symptoms. That conclusion is not clearly wrong.

III.
In their other two complaints, plaintiffs contend Dr. Price initially failed to obtain Mrs. Broadway's informed consent to the surgery and then, once complications manifested themselves, neglected to inform her of an alternate means of diagnosis, an ERCP.
In recognition of the right to selfdetermination, surgeons and other physicians are required to provide their patients with sufficient information to permit development of an informed and intelligent decision about whether to submit to a proposed course of treatment. When circumstances *1374 permit, the patient should be advised of the character of his ailment, the general nature and risks of the proposed treatment or procedure, the prospects of success, the hazards of failing to undergo any treatment or procedure at all, and the risks of alternate methods of treatment. Hondroulis v. Schuhmacher, 553 So.2d 398 (La. 1988); LaCaze v. Collier, 434 So.2d 1039 (La.1983).
In that informing the patient of all conceivable consequences will usually be impractical, the duty to disclose extends only to "material" medical and surgical risks. Hondroulis, supra; LaCaze, supra. The determination of materiality is a two-step process which relies on an objective, reasonable man standard in order to shield the physician from aberrational decisions on the part of the patient. Roussel v. Sharp, 569 So.2d 67 (La.App. 4th Cir.1990). First, the existence and nature of the risk are defined, together with the likelihood of its occurrence. This is established through expert testimony. Next, the fact-trier must decide whether a reasonable person in the patient's condition would attach significance to the specific risk. Hondroulis, supra.
Even if the undisclosed risk is said to be material, there additionally must be a causal relationship between the doctor's failure to disclose and the patient's damage. Hondroulis, supra; LaCaze, supra. Causation is likewise ascertained by an objective standard: whether a reasonable person in the patient's position would have consented to the operation had full disclosure been made. Hondroulis, supra.
Dr. Price did not contest Mrs. Broadway's assertions that, prior to the surgery, he did not advise her of the risk of severing the common bile duct. Such a complication, although a known risk, is very rare as previously discussed. Indeed, none of the testifying surgeons acknowledged specifically warning their patients of this remotely possible occurrence. Also, as demonstrated by the present case, an injury to the common bile duct can be successfully corrected.
Mrs. Broadway admitted at trial that, since 1977, she had suffered gallbladder attacks, some of an intensity requiring emergency room injections for pain. A "Second Surgical Opinion" form, reflecting a March 1985 diagnosis of "acute cholelithiasis" by her family physician, recommended removal of the gallbladder as "very necessary for her health." Applying the previously discussed standards to plaintiff's situation, we do not find the possibility of traumatizing the common bile duct to be a material risk requiring disclosure. Moreover, even assuming materiality, Mrs. Broadway failed to prove that a reasonable person in her position, armed with knowledge of the risk, would have refused surgery.
Nor does liability result from Dr. Price's failure to advise his patient of the availability of the ERCP test. The purpose of that procedure is to determine the patency of the bile duct, that is, whether bile flows freely through the vessel. The jury concluded that Dr. Price, unaided by hindsight and not suspecting injury to that structure, had no duty to discuss this study with her. That determination is not manifestly erroneous.

CONCLUSION
Accordingly, for the foregoing reasons, the judgment is affirmed with all costs assessed to appellant.
AFFIRMED.
NOTES
[1] The normal adult produces daily 1,000 to 1,500 cubic centimeters (cc) of hepatic bile. After surgery, plaintiff drained fluids as follows:
 1-5-85 (no record)
 1-6-85 220 cc
 1-7-85 280 cc
 1-8-85 440 cc
 1-9-85 370 cc
 1-10-85 380 cc
 1-11-85 670 cc
 1-12-85 (no record)

[2] Without bile in the digestive system, stools will be white or clay colored. The fact that Mrs. Broadway had brown stools indicated bile continued to enter the intestine.
[3] A procedure by which a contrast medium is injected into the bile ducts to allow study of the structures.
[4] The following amounts were recorded daily:
 2-15-85 600 cc
 2-16-85 400 cc
 2-17-85 650 cc
 2-18-85 550 cc
 2-19-85 525 cc
 2-20-85 850 cc