657 So.2d 777 (1995)
Louise RUSSO, Individually and as Administratrix of the Estate of Anthony P. Russo,
v.
Bert BRATTON, M.D., et al.
No. 94-CA-2634.
Court of Appeal of Louisiana, Fourth Circuit.
June 29, 1995.
*778 Silvestri & Massicot, Frank A. Silvestri, John Paul Massicot, Anthony L. Marinaro, New Orleans, for appellant.
Blue Williams, C.T. Williams, Jr., Bruce A. Cranner, Metairie, for appellee.
Before BARRY, BYRNES and LANDRIEU, JJ.
BYRNES, Judge.
Plaintiff/appellant Louise Russo brought this wrongful death claim for the death of her husband after an adverse ruling of a Medical Review Panel pursuant to LSA-R.S. 40:1299.41, et seq. Her claim is basically that the failure of Dr. Bert Bratton to diagnose and treat her late husband for a cryptococcal[1] infection deprived him of a chance of survival. A jury found that Dr. Bratton failed to exercise the applicable standard of care, but that his failure to do so was not the proximate cause of Anthony Russo's death *779 and did not deprive him of a chance of survival. Pursuant to the jury verdict, judgment was rendered in favor of the defendants Dr. Bratton and Pendleton Memorial Methodist Hospital ("Methodist"). Plaintiff filed a motion for partial new trial and judgment NOV which was denied. Plaintiff appeals. We affirm.
On July 31, 1984, the decedent went to his personal physician, Dr. James T. Flanagan, complaining of persistent headaches. Dr. Flanagan ordered a CAT scan of the decedent's brain which was performed at Methodist on August 21, 1984. The scan showed some swelling of the lateral ventricle section resulting in a hydrocephalic condition.
Dr. Flanagan consulted with Dr. Bratton. An EEG performed on August 29, 1984 showed abnormalities and a second CAT scan was felt by Dr. Bratton to show changes consistent with aqueductal stenosis which is a narrowing of the ducts that permit cranial fluids to drain properly.
On September 5, 1984 Dr. Bratton performed a ventriculogram at Methodist which he felt confirmed his diagnosis of aqueductal stenosis. Dr. Bratton surgically implanted a plastic shunt to permit cranial fluids to drain properly, thereby relieving the pressure. Other than some reaction to a dye used during the procedure, the decedent's recovery was unexceptional. A few days later on September 13, 1984 the decedent was discharged from the hospital.
On September 24, 1984 ten days after the decedent was discharged from the hospital following the first surgical procedure, the decedent returned for a follow-up exam. Dr. Bratton testified that at "that time, he had no complaints of headaches, was not taking any pain medication ..." Such findings were inconsistent with an ongoing cryptococcal meningitis. On October 22, 1984 he returned complaining of double vision and headaches. Concern that the shunt may not be working properly prompted Dr. Bratton to order a CAT scan at that time. The scan showed that the ventricles were dilated and an inspection of the shunt indicated that it was not working. Dr. Bratton did a surgical procedure to revise the shunt. The decedent had an uneventful postoperative recovery.
When Dr. Bratton saw the decedent on October 30, 1984 he reported neither headaches nor visual problems. At subsequent visits on November 5, 1984 and November 20, 1984 the decedent reported no headaches, but did report visual problems. Such visual problems were to be expected because of changes in cranial pressure caused by the shunt.
He returned to the hospital on December 10, 1984 complaining of nervousness, dizziness, and some mental confusion. Dr. Bratton testified that the CAT scans again showed a shunt obstruction, but showed no sign of infection. He had no fever. More particularly he had no stiff neck, a sign of meningitis.
Dr. Bratton performed another surgical procedure on December 12, 1984 during the course of which he replaced the catheter. Subsequently the patient developed signs of a shunt infection which was diagnosed as staph. His general condition worsened, but he was exhibiting no signs of cryptococcal meningitis. Staph infections in such situations are common and plaintiff does not allege that this infection arose as the result of any negligence on the part of the defendants. Nor does plaintiff allege that this infection had anything to do with decedent's death.
On December 18, 1984, a ventriculostomy was performed to replace the shunt with an external drain.
On December 23, 1984, Dr. Bratton determined that the ventriculostomy was obstructed. Dr. Bratton revised the ventriculostomy and performed a similar procedure again on December 27, 1984. Dr. Bratton testified that he cancelled his Christmas travel plans to watch over the decedent because his condition had deteriorated substantially by that time.
Right after Christmas Dr. Bratton noted that the laboratory reports showed a decline in the staph infection and the white blood count, both being signs of improvement. Paradoxically, the decedent's overall physical condition continued to deteriorate, so the *780 family asked Dr. Donald Richardson to see the patient.
Dr. Richardson assumed the primary care of the decedent and transferred him to Tulane University Medical Center where he was chairman of the neurosurgery department. Dr. Richardson arranged for Dr. Hanna, the infectious disease expert, to examine the decedent. Neither of these doctors, nor the Tulane University Medical Center have been sued in connection with these proceedings.
The decedent's condition continued to deteriorate. He died on January 30, 1985.
In addition to the hydrocephalic condition, the autopsy revealed the presence of cryptococcal bacteria at the base of the brain and that the decedent had bleeding in many areas of the brain (multi-focal hemorrhages).
Dr. Bratton explained that adult onset aqueductal stenosis is present from birth, but the patient is able to compensate until at some point in his life he loses the ability to compensate for reasons that medical science has never been able to explain.
Dr. Richardson described adult onset aqueduct stenosis as congenital with no known cause. He stated that "it's never been shown to be associated with any disease process", which would include cryptococcosis. His testimony was also consistent with that of plaintiff's expert, Dr. Wollman, to the effect that cryptococcal meningitis would involve the fourth ventricle which did not occur in this case.
Dr. Richardson testified that neither he nor Dr. Hanna, the infectious disease expert, was able to find any cryptococcal disease. It was Dr. Richardson's opinion that the cryptococcal cells found in the decedent's brain at autopsy got there only a short time before his death while he was on steroids. It was also his opinion that the decedent had delayed onset aqueductal stenosis. He explained that because of the serious side effects to be expected from the treatment of cryptococcal infections, that it would be inappropriate to undertake such treatment without a certain diagnosis. He stated that the crytococcosis arose only as a "pre-terminal" event when the decedent was already near death and did not contribute to that death. He also pointed out that had the infection been severe enough to cause basilar meningitis as asserted by the plaintiff, then it would normally have been immediately evident to the naked eye at autopsy. The autopsy indicated no such visual identification. Although Dr. Richardson was unable to explain what caused the "multi-focal angitis with multiple hemorrhages in his brain", he was able to state that such symptoms would not have been caused by cryptococcal meningitis. Dr. Wollman, plaintiff's expert also testified that he was unaware of cryptococcosis causing such multi-focal hemorrhages. According to Dr. Richardson, the fact that the fourth ventricle was not involved was also an indication that the decedent did not have cryptococcal meningitis. Dr. Richardson concluded that:
So, you know, we are stuck on a lot of patients. All I can tell you is my medical opinion and 30 years of practice at VA, Charity Hospital and in private practice in New Orleans, where I have seen literally 100,000 patients, this does not fit the picture of cryptococcal meningitis. It is something we needed to rule out and thought we had. The fact that they found it in his brain at autopsy is surprising to me, but its not unusual because cryptococcus is an organism that is very opportunistic. The man is on high dose steroids, we're trying to save his life, and he got an angiopathy. He is bleeding in his brain. He is bleeding into his ventricle. I haven't got a clue as to why he had that.
Dr. Barbara Hanna, an infectious disease expert gave the following testimony:
Q. Did Anthony Russo have cryptococcal meningitis?
A. He had an infection at autopsy. I do not believe he had a clinical cryptococcal meningitis, and certainly not at the time those tests were performed.
On cross-examination Dr. Hanna added:
The course of his illness, in my opinion, was incompatible with a diagnosis of cryptococcal meningitis as being the primary underlying cause. Patients with cryptococcal meningitis that are so terminally ill *781 as to be in the condition that Mr. Russo was in at the time he arrived at Tulane are really very easy to diagnose on stains and smears.... There was absolutely no reason to postulate cryptococcal infection.
* * * * * *
He had nothing to suggest ongoing infectious process.... He had no fever. His spinal fluid parameters when his ventriculitis was cleared returned to reasonably normal levels. His cell count came to normal. His glucose came to normal, and therefore he had no evidence of ongoing infectious process involving the meninges.
Dr. Hanna testified that cryptococcus organisms usually lie dormant in a person whose immune system has not been impaired and would not normally be treated even if it could be detected. Some cryptococcus organisms can be present in the brain, but until the immune system breaks down allowing those organisms to proliferate, a diagnosis cannot be made. The only conclusion to be drawn from the testimony of the infectious disease expert is that it was highly unlikely that cryptococcosis contributed to the decedent's death.
Dr. Lowell Hurwitz, a radiologist, testified that he saw no signs of cryptococcal disease on the CAT scans of August 21, 1984 and December 11, 1984. Dr. Hurwitz insisted that there had "never in the medical literature been the aqueductal stenosis associated with any infectious process, viral, bacterial or fungal."
Dr. James C. Harkin, the director of neuropathology at Tulane, gave the following testimony:
Q. Doctor, do you have any idea how long the cryptococcal cells had been in the brain?
A. Well, I would judge that mostly on the extensiveness of the lesions. If it was extensive in all of the sections, in all of the things, then it would have been there a long time. If it's very limited, it would be there for a shorter period of time.
Q. Was it very limited in this case.
A. Yes.
Q. Doctor, I want to pose a hypothetical to you. I want you to assume hypothetically that in the month before his death, Anthony Russo was on steroids. Given what you found on autopsy in this case, could the presence of the cryptococcal cells have been associated with the steroids?
A. Yes.
Q. Is that because cryptococcal cells typically attack persons with reduced immune response?
A. Yes....
Q. If we assume in Anthony Russo's case that he was on steroids for the 30 days before his death, would you then assume that the cryptococcal cells entered his brain within, say, three weeks of his death?
A. I think it would be possible that they were there for three weeks and no longer.
Q. And no longer?
A. (Indicating yes).
Q. Can you state to a reasonable degree of medical probability that cryptococcal cells were not in his brain in September of 1984?
A. Reasonably, but it wouldn't be 100 percent sure.
Q. But it is more likely than not?
A. Oh, much more.
Q. How about October of 1984. Is it more likely than not that the cryptococcal cells were not in his brain?
A. More likely.
Q. And as to November?
A. More likely.
Q. And December?
A. Well, I'm not sure I can be that accurate.
Q. But they certainly weren't there the beginning of Dr. Bratton's care of Mr. Russo back in September?
A. I wouldn't think so.
* * * * * *
Q. Doctor, what was the principal cause of death of Mr. Russo?
A. Bronchopneumonia.
Dr. Joseph M. Epps, Jr., a neurosurgeon, gave the following testimony:

*782 Q. There was a glucose test that was done, the glucose was normal?
A. Yes.
Q. What is the significance of a normal glucose test?
A. In the face of infection, the bacteria will begin to [digest] the glucose as a means of their nutrition and, as a result, the glucose in the spinal fluid will fall in the face of infection. As the infection is resolved, the glucose will return to normal level.
Q. So where there is normal glucose, can a neurosurgeon conclude that there is no underlying infection?
A. Or that it is being treated properly.
. . . . .
Q. When a patient has a cryptococcal meningitis, what do you expect to see in the glucose test?
A. In it, as in any infection, you would expect that the glucose would begin to go down.
Based on this testimony by Dr. Harkin, the jury could have reasonably concluded that the problems which led to the decedent's death arose prior to the manifestation of the cryptococcal infection.
Dr. Epps testified that most patients who have cryptococcosis have AIDS or some other immuno-compromising situation such as the steroids that were prescribed for the decedent near the end of his life. He pointed out that the various infectious disease tests performed on the decedent during the course of his illness confirmed the absence of cryptococcus.
He also testified that he was unaware of cryptococcal infections causing multi-focal hemorrhages such as those experienced by the decedent prior to his death.
Plaintiff's expert neuropathologist, Dr. Wollman, testified that the decedent's diaphoreses (profuse sweating) was not a typical symptom of cryptococcal infection, and that he did not know if nausea, vomiting, and changes in mental status were normal symptoms. Because Dr. Wollman's expert testimony was critical to proving plaintiff's case, it is worth quoting at some length to show that he failed to establish any basis from which the jury could reasonably have concluded that probably or more likely that not cryptococcosis was the cause or a contributing cause of the decedent's death:
Q. You have no proof that cryptococcal disease was the cause of Anthony Russo's death, do you?
A. That's correct.
Q. All right. You do have some proof, though, that Anthony Russo had aqueductal stenosis, don't you?
A. Yes. There was clinical evidence of that. [Emphasis added.]
Q. That's right. Aqueductal stenosis, that's the kind we're talking about, adult onset, obstruction of the aqueduct of Sylvius, isn't that it?
A. Yes
Q. And what the aqueduct of Sylvius is obstructed by are types of cells, aren't they?
A. There are many things that can cause obstruction of aqueduct of Sylvius.
Q. And in Anthony Russo's case, what kind of tissue did you find from the aqueduct that were obstructing it?
A. As I said, what was present at the distal part of the aqueduct was simply a proliferation of fibulary (phon.) astrocytes.
Q. Fibulary astrocytes? What are they?
A. They can be just a chronic reaction type of cell. They can be present from any cause.
Q. In layman's terms, can we call that scar tissue?
A. Yes. That's possible.
Q. And what are Rosenthal fibers?
A. They simply indicate that this type of proliferation in these astrocytes was there for a relatively long period of time.
Q. So they give a pathologist a sense of chronicity, meaning the tissues had been there for a long time?
A. Yes. That's correct.
Q. Just as one would expect that's a congenital condition?
A. Yes. [Emphasis added.]

*783 Q. And those fibulary astrocytes with the Rosenthal fiber, that would indicate they were there for a long time, were present in the aqueduct, weren't they?
A. Sure, the aqueduct.
Q. And their presence is consistent with the diagnosis of adult onset of aqueductal stenosis?
A. Yes, it's consistent. [Emphasis added.]
Q. And, indeed, that was one of your diagnoses in this case, wasn't it?
A. Yes, that's correct.
Q. Aqueductal, adult onset aqueductal stenosis, causes hydrocephalus, doesn't it?
A. Yes. That's correct.
Q. And hydrocephalus, if left untreated, will cause eventual destruction of the brain, wouldn't it?
A. That's usually the case. It causes expansion of the entribes (phon.) and hydrocephalus is actually expansion of the ventricles.
Q. And aqueductal stenosis causes an expansion of the
A. Yes.
Q. In adult aqueductal stenosis, the ventricles that are involved are the lateral and the third, typically?
A. That's correct.
Q. The fourth is typically uninvolved, is that correct?
A. That's correct.
Q. And in this autopsy, we learned that the fourth ventricle had no involvement that is reported, the fourth ventricle was normal in this case, wasn't it?
A. That's what was reported.
* * * * * *
Q. Let's talk about cryptococcal, clinical cryptococcal disease for a minute. Typically, clinical crytococcal disease causes basilar meningitis, doesn't it?
A. That's what the literature states. [Emphasis added.]
Q. And that can cause hydrocephalus, can't it?
A. By obstructing the outflow from the fourth ventricle.
* * * * * *
Q. So if the patient has a basilar meningitis and it is causing the hydrocephalus, you would expect to see the fourth ventricle involvement?
A. That's correct.
Q. There was no fourth ventricle involvement?
A. Certainly not from the CT scan.
Q. So you cannot conclude that basilar meningitis was the cause of the hydrocephalus, was it?
A. That's correct? [Emphasis added.]
Q. Indeed, the only cause of hydrocephalus that you found in your review of the tissues, in your review of the autopsy was in the area of the aqueduct, is that correct?
A. That's correct.
Q. The aqueductal stenosis, is that correct?
A. That's correct.
Q. And the same aqueductal stenosis that is congenital?
A. That's correct. But I also have to say that we did not have the area of the outlet from the fourth ventricle to examine it.
Q. Doctor, it is purely speculation on your part that Mr. Russo had a lesion in the area of the aqueduct caused by cryptococcosis, is that correct?
A. That's correct. I don't even speculate that. I don't know what the cause of the aqueductal stenosis was. [Emphasis added.]
* * * * * *
Q. And based upon your review of the medical records that he had hydrocephalus?
A. That's correct.
Q. And based upon your review of the medical records and your finding of the cells which created a narrowing of the aqueduct, couldn't you say that the hydrocephalus was caused by the aqueductal stenosis?
A. Yes. It's most likely the obstructive hydrocephalus was caused by a narrowing *784 of the aqueduct, which was presumably due to this proliferation of astrocytes.
Q. And the astrocytes, the cells that you found with the Rosenthal fibers, that is consistent with the diagnosis of histological aqueductal stenosis?
A. It's consistent with that. [Emphasis added.]
The most that can be said of Dr. Wollman's testimony is that he did not rule out the mere possibility that cryptococcosis was a contributing cause of the decedent's death. He could not say that probably or more likely than not it was a contributing cause.
The plaintiff failed to show that no reasonable juror could believe the testimony of those experts who gave testimony favorable to the defense. The trier of fact determines which of the experts to believe. Miller v. Miller, 602 So.2d 330 (La.App. 4 Cir. 1992). We cannot say that the jury was manifestly erroneous if they chose to find that decedent was not deprived of a chance of survival by cryptococcosis.
As plaintiff has failed to show manifest error, per force she has failed to meet the even higher standards required to support her motion for a JNOV:
A JNOV is warranted when the facts and inferences point so strongly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely there is a preponderance of evidence for the mover.... In making this determination, the court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party. [Emphasis added.]
Anderson v. New Orleans Public Service, 583 So.2d 829, 832 (La.1991). Therefore, it was not error for the trial court to deny plaintiff's motion for a JNOV.
Likewise, it was not error for the trial court to deny plaintiff's simultaneous motion for a new trial. Plaintiff failed to establish the existence of any of the three peremptory grounds for a new trial set forth in LSA-C.C.P. art. 1972 that would entitle her to a new trial as a matter of right.
Plaintiff contends that the jury's finding of malpractice in this case compels a finding of causation. Plaintiff argues that "the malpractice was the failure to rule out or treat a life threatening possible cause of the patient's condition, cryptococcosis, a disease which is fatal when untreated, and which was proven to have been present by autopsy." Plaintiff alleges that at the very least as a result of the negligence of the defendants, the decedent was deprived of a chance of survival.
The jury found only that "Dr. Bert Bratton failed to meet the applicable standard of care in his treatment of Anthony Russo." There is nothing in the record to indicate explicitly what the jury felt Dr. Bratton did or did not do that failed to meet the applicable standard of care, or when during the course of decedent's treatment he did or did not do it. Viewing the record as a whole, the most plausible and reasonable explanation is that the jury found that Dr. Bratton should have ordered more comprehensive tests for crytococcosis, but that cryptococcosis was neither the sole cause, nor a contributing cause of the decedent's death. A view of the record as a whole shows that such findings would be neither unreasonable, clearly wrong, mutually exclusive, nor inconsistent. We hold that the jury's finding of malpractice is not tantamount to a finding of causation.
Plaintiff further argues that when the jury found that Dr. Bratton failed to meet the standard of care due the decedent it created a presumption of causation, and the failure to so instruct the jury was error. Plaintiff cites no authority to support this contention. LSA-R.S. 9:2794A(3) and the cases decided pursuant thereto clearly place the burden on plaintiff of proving causation in addition to proving the failure to exercise the appropriate standard of care. Plaintiff's argument of error has no merit.
The plaintiff contends that it was error for the trial court to limit the testimony of Dr. Wollman, her expert neuropathologist. The *785 trial court allowed Dr. Wollman to give considerable testimony as an expert, but properly disallowed testimony in areas where Dr. Wollman professed to lack expertise as may seen by reference to his testimony footnoted below.[2]
Regardless, plaintiff argues that it was not necessary to prove standard of care and causation with expert testimony, and that it was error for the trial court to instruct the jury otherwise. Pfiffner v. Correa, 643 So.2d 1228, 1236 (La.1994). Pfiffner does not support plaintiff's contention. Pfiffner says that "jurisprudence has also recognized that there are situations in which expert testimony is not necessary." Id. at 1233. Pfiffner gives numerous examples of obviously careless acts such as amputating the wrong arm, the failure of an on-call physician to respond to an emergency, or the violation of a statute, etc. None of what plaintiff alleges was proven, even if accepted *786 as true for purposes of argument, is even arguably analogous to the exceptions envisioned by Pfiffner. Therefore, as a matter of law, plaintiff's claim must be proved by expert testimony. We also note that plaintiff failed to prove her claim by the preponderance of the evidence even if we were to ignore the expert testimony requirement.
Plaintiff assigns as error the failure to give a res ipsa loquitur charge to the jury because "aqueductal stenosis in a 37 year old is very unusual." The test for res ipsa is whether the injury would normally occur in the absence of negligence. White v. McCool, 395 So.2d 774, 777 (La.1981). The fact that the decedent suffered from an unusual affliction in no way raises a presumption of negligence. If that were the case we would quickly discourage the treatment of unusual and rare ailments. That something is medically uncommon does mean that it is unnatural, i.e., it does not mean that it was caused by the negligence of man instead of arising in the course of nature.
There was also sufficient credible expert testimony to enable the jury to conclude that the decedent's death was not the result of some unexplained cause[3] that would raise the presumption of defendants' negligence, but was instead the result of a congenital aqueductal stenosis. The fact that plaintiff experienced brain hemorrhaging that was never explained by experts on either side does not mean that aqueductal stenosis was not the cause of the plaintiff's death. Nor was it proven that such hemorrhaging normally occurs only as a result of negligence:
"It is generally conceded that res ipsa loquitur in no way modifies the rule that negligence will not be presumed. The application of the rule does not, therefore, dispense with the necessity that the plaintiff prove negligence, but is simply a step in the process of such proof, permitting the plaintiff, in a proper case, to place in the scales, along with proof of the accident and enough of the attending circumstances to invoke the rule, an inference of negligence, thereby obtaining an advantage and placing on the defendant the burden of going forward with proof to offset that advantage.... This inference is not drawn merely because the thing speaks for itself, but because all of the circumstances surrounding the accident are of such a character that, unless an explanation can be given, the only fair and reasonable conclusion is that the accident was due to some omission of the defendant's duty." Id.

In the instant case it cannot be said that "the only fair and reasonable conclusion" is that the decedent's death was caused at least in part by cryptococcosis.
Plaintiff also cites Broadway v. St. Paul Ins. Co., 582 So.2d 1368, 1372 (La.App. 2 Cir.1991) and Orgeron v. Lafourche Parish Hosp. Dist. No. 1, 625 So.2d 739 at 741 (La.App. 1 Cir.1993) in support of her res ipsa argument.
The Broadway court at 1372 in language that is equally applicable to this case found that res ipsa did not apply:

*787 Since insult to the common bile duct can occur without negligence, res ipsa loquitur is not applicable.
Likewise in Orgeron the court determined at 741 that "plaintiff failed to establish that the injuries she suffered ... would not have occurred in the absence of negligence."
Plaintiff has failed to cite any case that would support the application of res ipsa to the facts of the instant case.
In any event, plaintiff acknowledges in her brief that no request was made for a res ipsa charge in the lower court and no contemporaneous objection was made to the charge given. The issue cannot now be raised on appeal. LSA-C.C.P. art. 1793(C).
Plaintiff cites cases that say that where a patient receives improper treatment that destroys that patient's chance of survival, the plaintiff does not shoulder the "unreasonable burden" of proving that the patient would have lived had proper treatment been given. Smith v. State through Dept. of Health and Human Resources Admin., 523 So.2d 815, 820 (La.1988); Hastings v. Baton Rouge General Hosp., 498 So.2d 713 (La. 1986). From these cases the plaintiff argues that to "require plaintiff to prove Dr. Bratton would have found cryptococcosis in September, October, November or even December, thus making treatment possible, and thus possibly saving his life, is to impose on appellant the unreasonable task of proving what might have happened ..."
When Smith says that the plaintiff does not have the burden of proving "with certainty" that the decedent would have lived, it does not relieve the plaintiff of the burden of showing that the decedent was deprived of a chance of survival and that that deprivation was caused by the negligence of the defendants. Thus plaintiff has the burden of proving that the decedent had a chance of survival, and that the defendants' negligence deprived him of that chance. Applying the Smith standard to the instant case, the plaintiff must prove that more likely than not cryptococcosis was a contributing cause of the decedent's death; and that a possibility of treatment existed which would have afforded the decedent a possibility or chance of survival. Smith only relieves plaintiff of the burden of proving that the decedent would in fact have survived.
The defendants presented credible evidence to show that the decedent died of congenital aqueductal stenosis. On this basis alone the jury could reasonably exonerate the defendants for lack of causation. Additionally, defendants produced credible evidence to show that at the time of his death the decedent had not had the cryptococossis long enough for it to have contributed to his death.
Plaintiff is not required to show that the decedent would definitely have survived had he been properly treated for cryptococcosis, only that he had a chance to recover if so treated and that the defendants' negligence deprived him of that chance. This is the same thing as saying that the plaintiff had the burden of showing that cryptococcosis was the cause or a contributing cause of the decedent's death, and that the possibility of successful treatment existed, for if cryptococcosis was not at least a contributing cause of the decedent's death and that at least a possibility of treatment existed, defendants can have done nothing to deprive the decedent of the possibility of survival by failing to diagnose and treat it. Plaintiff failed to prove either. This is consistent with Hastings where the court stated at 722 that it was "necessary to show a reasonable probability that the procedure would have been life saving in these circumstances."
Just as in the instant case, the court in Smith was faced with the allegation that the negligent failure to diagnose and timely treat the decedent deprived him of a chance of survival. In Smith the court applied the Hastings "chance of survival" standard, but rejected plaintiff's claim at 821 with language that is equally applicable to the facts in the instant case:
"There is simply no evidence in the record as to whether treatment undertaken earlier would have provided the decedent a chance of survival that she otherwise would not have had. Plaintiff's expert said that it was "possible" that measures could have been undertaken which would have increased the patient's *788 chances of survival, but he did not specify what those measures were and he did not assess in any detail what the quantitative chances of survival would have been. Dr. Staudinger indicated that he would have adopted a different treatment plan if he had received at an earlier time the same EKG result he obtained at 11:45 P.M. However, there is no evidence which shows that those measures would have increased the chances that the patient would have avoided or survived a cardiac arrest." [Emphasis added.]
Although Dr. Wollman testified that a cryptococcal infection was a possible cause of the decedent's shunt blockage, he did not say that it was the cause "more likely than not" or that it was the "probable" cause or other words to that effect. Dr. Wollman also testified that the type of cells he found obstructing the aqueduct were the type to be expected from a congenital condition consistent with adult onset aqueductal stenosis, which was one of his diagnoses of the decedent's condition. Dr. Wollman also stated that had the decedent's hydrocephalic condition been caused by a basilar meningitis such as cryptococcal meningitis that one would expect to see fourth ventricle involvement. Dr. Wollman found no fourth ventricle involvement. Dr. Wollman did not find that basilar meningitis was a cause of the decedent's hydrocephalus.
Dr. Flanagan, the decedent's personal physician, was qualified as an expert in internal medicine. It was he who referred the decedent to Dr. Bratton. He testified that although it was possible that the decedent had some cryptococcal infection, it would not have been a cause of his condition. He never saw any symptoms of such an infection. Dr. Flanagan was confident that the decedent had no latent undiagnosed cryptococcal disease from 1982. It was his opinion that if the decedent had had such an infection it might have become opportunistic in his brain near the end of his life because the steroids he was taking would have suppressed his immune system.
As the best inference to be drawn from the jury verdict is that the jury found that more probably than not that cryptococcosis was not a contributing cause of the decedent's death; as after reviewing the record as a whole we cannot say that such a finding is unreasonable; and as plaintiff's argument that Dr. Bratton's malpractice deprived decedent of a chance of survival is not supported by the record, we find no basis for reversing the judgment of the trial court.
For the foregoing reasons the judgment of the trial court is affirmed.
AFFIRMED.
NOTES
[1] Cryptococcosis is a fungal infection caused by the cryptococcus organism. In this case, plaintiff argues that it was responsible for a basilar meningitis that led to the decedent's death.
[2] Q..... You are not an expert in neurosurgery, are you?

A. That's correct?
Q. You've never been trained in neurosurgery?
A. That is correct.
Q. You're not an expert in neuroradiology?
A. That is correct.
Q. You have never been trained in neuroradiology?
A. That is correct.
Q. You do not treat patients on a daily basis, do you?
A. That's correct.
Q. When a person walks into your hospital with a complaint of headaches or other similar neurological or neurosurgical problems, you're not the treating, principal treating physician, are you?
A. That's correct.
Q. And you're not ultimately responsible for making the diagnosis as a pathologist, are you?
A. That is correct.
Q. The clinical physician who is responsible for the gathering both the clinical evidence, the laboratory reports and the reports from pathology which may have the anatomical diagnosis and any other factors in making overall diagnoses, isn't it?
A. That's correct.
Q. You don't do ventriculogram, do you?
A. That's correct.
Q. You have never done one?
A. Never.
Q. You never put a burr hole in someone's head and put the dye in and taken
A. I have never.
Q. You don't read them, either?
A. Not officially.
Q. Because that's not within your area of expertise?
A. That is correct.
Q. In fact, you haven't treated a patient at all since you were in training in the seventies, is that correct?
A. That's correct.
Q. You haven't personally treated, as a treating physician, adult onset aqueductal stenosis, have you?
A. No.
Q. You haven't personally treated as a treating physician cryptococcal disease, have you?
A. That's correct.
Q. You never put a shunt tube in a patient's brain?
A. No, never have.
Q. Have never had to revise a shunt?
A. No.
Q. You are not officially qualified to give a report on a CT scan, are you?
A. That's correct.
Q. And, of course, you have never treated as a treating physician a person with hydrocephalus of unknown etiology, have you?
A. No, I have not.
Q. And because those areasbecause you're not a neurosurgeon, you have no training in neurosurgery, you're not board certified in neurosurgery, you are not competent to testify as to the standard of care that a board certified neurosurgeon must meet in neurosurgical areas, are you?
A. No, I'm not.
* * * * * *
Q. Doctor, although the neuropathologist can confirm and prove or disprove histologically a diagnosis made by a neurosurgeon and, for that matter, a surgeon at autopsy, the neuropathologist's role does not include commenting as to whether or not that diagnosis was a breach ofthat diagnosis, if wrong, was a breach of the standard of care does it?
A. That's correct.
* * * * * *
Q..... What you can agree with is that your role as a neuropathologist is limited to looking at tissue histologically, samples, either microscopically or grossly, and determining whether or not that tissue demonstrates, proves or disproves a diagnosis?
A. That's correct.
Q. And now, misdiagnosis is a different question, isn't it? Misdiagnosis means a clinician, given all of the information that was available to the clinician and obviously before death, was wrong?
A. That's correct.
Q. And a pathologist's job is not to determine whether a misdiagnosis was made by the clinician, but to determine whether the diagnosis was correct or incorrect?
A. I think I can agree with that.
[3] In effect, plaintiff argues that Martin v. East Jefferson General Hosp., 582 So.2d 1272 (La. 1991), stands for the proposition that the negligent failure to rule out a condition that is potentially fatal if untreated is not only malpractice, but tantamount to proving that that condition was the cause or a contributing cause of the decedent's demise. Instead, the Martin court at 1278 determined that "lupus was more probably than not the cause of death, and that Dr. Ahmed's improper treatment destroyed Ms. Wells' chance to survive this treatable disease." In the instant case the fact finder made no finding that cryptococcosis more probably than not was the cause, or a contributing cause of decedent's death. Moreover, in Martin the Supreme Court's finding on causation was based on a manifest error standard of review which caused it to reverse the appellate court. The Supreme Court declared that the appellate court should not have reverse the lower court's findings of fact because:

"The district judge, sitting as fact finder, was best able to assess the credibility of the witnesses who gave conflicting testimony as to the cause of death. The district court's evaluation that plaintiff's medical expert was more credible was reasonable determination, and the court of appeal erred in substituting its own evaluation." Id.
Thus this court is admonished by the holding in Martin not to substitute our own evaluation for the fact finder/jury's "reasonable inferences drawn from the evidence and his resolution of credibility issues." Id. at 1279.