594 So.2d 449 (1991)
J. Robert WHIDDON
v.
DR. Robert L. ELLIOTT, d/b/a the Breast Clinic and St. Paul Fire and Marine Insurance Company.
No. 90 CA 1761.
Court of Appeal of Louisiana, First Circuit.
December 27, 1991.
*450 Donnie L. Floyd, Donn Moss and John Dugas, Baton Rouge, for plaintiff-appellant J. Robert Whiddon.
Myron A. Walker, Jr., Baton Rouge, for defendants-appellees Dr. Robert L. Elliott and St. Paul Fire and Marine Ins. Co.
Before SHORTESS, LANIER and CRAIN, JJ.
CRAIN, Judge.
J. Robert Whiddon had enlarged breasts and was extremely self conscious of this condition. He consulted Dr. Robert L. Elliott, who made the clinical diagnosis of obesity and severe gynecomastia and recommended excision of the breast tissue as the course of treatment. Dr. Elliott performed a bilateral subcutaneous mastectomy in April, 1985. Whiddon developed several postoperative complications, most of which apparently resolved. He subsequently became displeased with the results of the surgery, complaining of excessive or redundant folds of skin which sagged on either side of the nipples of both breasts, the asymmetric appearance of his breasts (the right breast is larger than the left) and the inverted nipple of the left breast.
He instituted this action against Dr. Elliott on theories of malpractice and lack of informed consent. After trial on the merits the trial court granted defendants' motion for involuntary dismissal. From this *451 judgment, Whiddon appeals alleging as error the trial court's granting of defendants' motion for involuntary dismissal, determining (1) that plaintiff failed to prove that defendant committed malpractice under La. R.S. 9:2794, and (2) that Whiddon had impliedly consented to the surgical procedure.
In determining whether to grant a motion for involuntary dismissal the trial judge should evaluate the evidence and render a decision based upon whether the opponent to the motion has proved his case by a preponderance of the evidence. Fuller v. Wal-Mart Stores, Inc., 519 So.2d 366 (La.App. 2d Cir.1988). In reviewing the granting of a motion for involuntary dismissal by a trial court, the appellate court determines whether the trial court was manifestly erroneous in finding the plaintiff failed to carry the burden of proof. Matherne v. Rise, 479 So.2d 580 (La.App. 1st Cir.1985).
La.R.S. 9:2794(A) provides that in a malpractice action based on the negligence of a physician, the plaintiff has the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians... within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
Plaintiff was referred by his family physician to Dr. Elliott for a consultation for possible surgical reduction of his enlarged breasts. He testified that Dr. Elliott guaranteed that after surgery he would have a "normal male chest." The initial consultation was on February 5, 1985. Whiddon was obese at the time of that consultation (5'8" tall and approximately 100 pounds overweight). It is uncontroverted that Dr. Elliott told plaintiff that he would have to lose weight before surgery could be performed. Plaintiff allegedly lost 30-40 pounds and returned to Dr. Elliott's office on March 25, where the prospective surgery was discussed. He stated that Dr. Elliott did not discuss a plastic surgery option nor did he discuss possible adverse cosmetic effects of the subcutaneous mastectomy. He again visited Dr. Elliott's office on April 16 for a preoperative visit. The surgery was performed on April 17, 1985. At the time of trial plaintiff was still obese.
Dr. Elliott is a board certified general surgeon who for the past seventeen years has limited his practice to diseases and cancer of the breast. It is undisputed that a general surgeon is generally accepted to perform breast surgery on both males and females. Dr. Elliott stated that at the initial consultation plaintiff told him that he was overweight and had tried unsuccessfully to lose weight on numerous occasions; and that he had large breasts for a long time and wanted a flat chest so that he could wear a t-shirt to the beach. Dr. Elliott thought that obesity was a large contributing factor to the gynecomastia or enlarged breasts. He further stated that he decided to perform the bilateral subcutaneous mastectomy without incorporating a skin reduction envelope procedure because a reduction procedure was indicated neither preoperatively nor at the time of surgery. Dr. Elliott's reasons for not performing a skin reduction envelope procedure in addition to excising the breast tissue is because plaintiff's nipple was centrally located on his breast mound and a skin reduction procedure is indicated on a patient with a nipple pointing downward on a pendulous or ptotic breast. Neither was a skin reduction indicated during surgery because after *452 completion of the subcutaneous mastectomy plaintiff's skin fit flat against his chest wall; there was no redundant excess skin. Further, he stated that plaintiff's skin folds were the result of obesity, not excess redundant skin.
Dr. Robert H. Krupkin, a general surgeon specializing in diseases of the breast, was accepted by the court as an expert in that field and testified on behalf of plaintiff. Dr. Krupkin was formerly employed by Dr. Elliott and was fired by Dr. Elliott in 1984 for reasons unrelated to this case. Dr. Krupkin stated that the animosity between him and Dr. Elliott was no longer foremost in his mind; that he would try to be as objective as he possibly could; and that "there is no vendetta here." He stated that in 1985 it was an acceptable and common practice and was within the expertise of a general surgeon to perform breast reduction procedures on males as well as females; and that a subcutaneous mastectomy is a common procedure for the treatment of gynecomastia. In Dr. Krupkin's opinion the standard of care would have required the surgeon to also resect the skin envelope to remove redundant skin which was left after removal of breast tissue in order to correct the total appearance, which Dr. Elliott failed to do. Dr. Krupkin stated that in 1985 he would probably have attempted to perform the skin reduction procedure himself rather than refer it to a plastic surgeon. He stated that the determination of whether to perform a skin reduction must be made by the physician preoperatively upon evaluation of the extent of the breast enlargement and how much tissue (fatty or glandular) is to be removed. If a significant amount of tissue will be removed and its removal will create excess skin and cause male positioning of the nipple areolar complex, then reduction of the skin envelope is necessary. The surgeon should also make a judgment based on the expected and anticipated elastic propensities of the skin and whether it will shrink to compensate for any skin redundancy. He further stated that a difference in opinion between Dr. Elliott and himself regarding selection of the proper procedure to be performed does not of itself indicate that Dr. Elliott was guilty of malpractice. On cross-examination he admitted that he had not seen plaintiff's condition prior to surgery and that he (Dr. Krupkin) would be in a better position to form an opinion on this case if he had examined plaintiff preoperatively.
Dr. Krupkin could find no fault with the technical accuracy of the procedure performed by Dr. Elliott, and he agreed that the postoperative complications suffered by plaintiff (other than the redundant skin) could occur without the presence of negligence or malpractice. Among the possible recognized complications of breast reduction surgery which could occur without the presence of negligence or malpractice are: residual skin redundancy, inversion of the nipple, scarring, infection and asymmetry of the breasts. He further stated on cross-examination that if Dr. Elliott testified that plaintiff exhibited no skin redundancy on the May 20, 1985, pre-operative office visit that he (Dr. Krupkin) could not dispute such findings; and that residual skin redundancy will occur if the skin shrinkage does not occur as predicted as well as if an insufficient amount of skin is removed.
Dr. Martin Louis Bell, a plastic surgeon, certified by the American Board of Surgery and the American Board of Plastic and Reconstructive Surgery, was accepted by the court as an expert in general surgery of the breast. In his opinion a general surgeon should not have undertaken to perform surgery. Dr. Bell stated that although a subcutaneous mastectomy for the reduction of enlarged male breasts was within the realm of expertise of a general surgeon in 1985, the procedure should not have been performed by Dr. Elliott on this patient because this patient's breasts were enlarged to a size similar to the normal female breast. The proper technique would have included excision of redundant excess skin, which is a complicated procedure and should be performed by a plastic surgeon. The possible complications of skin reduction included definite chances of circulation problems to the nipple and partial or complete nipple loss. The possibility of those complications are much less in a *453 subcutaneous mastectomy. In his opinion the redundant skin was not the result of fat or adipose tissue, it was excess redundant skin. He stated that determining the appropriate procedure is a judgment call which should be made by the physician at the time of the patient's preoperative examination and must be based on the patient's preoperative appearance, including the size of his breasts. Dr. Bell stated that he had not seen plaintiff prior to the surgery, thus he had no way of judging the extent of the enlargement of plaintiff's breasts prior to surgery, and that knowledge of plaintiff's appearance at that time would be most helpful in formulating an opinion. Dr. Bell further stated that he was aware of some resentment in the medical community against Dr. Elliott because Dr. Elliott holds himself out as an expert in breast disease. Dr. Bell added that he feels that Dr. Elliott is practicing in areas in which he should not, i.e., plastic surgery. He also stated that if plaintiff were informed of the possibility of adverse cosmetic results then he could take no issue with the treatment received by plaintiff from Dr. Elliott.
Although both Dr. Bell and Dr. Krupkin were of the opinion that plaintiff should have undergone a procedure which involved reduction of excess skin at the time the breast tissue was excised, Dr. Bell thought a general surgeon was unqualified to perform that procedure. Dr. Krupkin thought that a general surgeon would have been qualified to do so. Both experts stated that the selection of the appropriate procedure is a judgment call which should be made by the physician at the preoperative consultation based on the extent of breast enlargement of the patient. Both experts based their opinions on examination of plaintiff at least two years after surgery. Neither knew the extent of plaintiff's breast enlargement because neither had examined him preoperatively or even seen photos of him taken immediately before surgery, although both stated that this would have been most helpful in formulating their opinions.
After careful review of the record, we conclude that the testimony presented by the plaintiff was so equivocal as to whether defendant committed malpractice that the trial court was not manifestly erroneous in determining that plaintiff failed to prove by a preponderance of the evidence that Dr. Elliott's actions constituted malpractice.

INFORMED CONSENT
The only written consent to surgery given by plaintiff was a standard hospital form supplied by Baton Rouge General Hospital and was obtained from plaintiff by a hospital employee. It does not meet the criteria set forth in La.R.S. 40:1299.40. However, informed consent may be verbal so long as it meets the established criteria. To make an informed decision regarding whether to consent to a proposed method of treatment the patient must be informed of any material risk associated with the procedure. Additionally, there must be a causal relationship between the failure to disclose that material information. The test for causation is "whether a reasonable patient in the plaintiff's position would have consented to the treatment or procedure had the material information and risks been disclosed." Hondroulis v. Schuhmacher, 553 So.2d 398, 412 (La.1989).
Plaintiff contends that he was not informed of the potential adverse cosmetic results of the subcutaneous mastectomy procedure, which resulted in sagging excess folds of skin and was not informed that a different type of procedure which included recision of excess or redundant skin would have achieved an optimal result.
Plaintiff testified that Dr. Elliott informed him that his condition was diagnosed as gynecomastia, a condition which could be treated by removal of the fatty breast tissue. Both prior to and subsequent to the surgery plaintiff was informed that he was obese and that better results could be achieved if plaintiff lost significant amounts of weight. He further stated that Dr. Elliott knew that plaintiff wanted the breast reduction for cosmetic reasons and allegedly told him that the procedure would result in plaintiff's having a "normal male chest." He admitted that Dr. Elliott informed him of possible complications *454 such as infection but did not advise him that the results of the subcutaneous mastectomy would be cosmetically displeasing. Conversely, Dr. Elliott testified that he told plaintiff not to expect significant cosmetic changes other than a flat chest.
In written reasons for judgment the trial court stated that plaintiff had not met his burden of proving by a preponderance of evidence his lack of informed consent to the procedure. Plaintiff's recovery on this issue was negated by plaintiff's response to questioning that in the frame of mind he was in before the surgery had he been apprised of the possibility that the results would not be cosmetically or aesthetically pleasing he would have consented to the procedure anyway. A review of the record reveals the following:
By Plaintiff's Counsel:
Q. Again, looking at yourself, if you would have known that the so-called normal looking chest that you were to have would end up looking like this, would you have consented to the surgery?
A. No, I would not have.
. . . .
By Mr. Walker:
Q. Good morning, Mr. Whiddon.
A. Good morning.
Q. Mr. Whiddon, I'd like for you if you would, sir, to tell us if you had been advised of the possibility of an adverse cosmetic result, would you still have gone through with the surgery?
A. Would you rephrase that, please?
Q. Yes, sir. If you had been told that this surgery might not turn out cosmetically as you had hoped, would you still have gone through with it?
A. No, sir, I wouldn't have.
Q. Do you recall, Mr. Whiddon, when I took your deposition on May 14, of 1987, in this case?
A. Yes, sir.
Q. And your attorney was present?
A. Yes, sir.
Q. And you were under oath at that time, correct?
A. Yes, sir.
Q. You were sworn to tell the truth, and you knew that?
A. Yes, sir.
Q. I refer you to page 53, Mr. Whiddon
Mr. Walker: I'm sorry, page 52, Counsel.
By Mr. Walker.
Q. Question I asked you, "Going back to what you were told about this operation before you had it, what Dr. Elliott told you, and I want you to place yourself in the frame of mind that you were in then, okay?" Answer: "Um-huh." Question: "Not knowing what you know, can you do that?" Answer: "Okay." Question: "And tell me that if you had walked into Dr. Elliott's office and he had told you about this operation and had also told you that there was a chance that cosmetically it might not turn out the way you had hoped, do you think you still would have had the operation?" Answer: "Is this hypothetical?" Question: "Yes. And obviously feeling what you were feeling at the time?" Answer: "At the time, yes." Question: "You would have had it even though you would have been told that you might not have had a cosmetically successful result?" Answer: "Yes. "Do you recall giving that testimony, Mr. Whiddon?
A. Yes, I do.
Q. And you did give that testimony at that time?
A. Yes, I did.
Q. Under oath?
A. Yes, under oath.
. . . .
Q. Dr. Elliott never did tell you that he was going to do anything other than remove gynecomastic tissue from under your skin; right?
A. That's what he told me.
Q. He never told you he was going to take off any skin, did he?
A. He said I would have a normal looking male chest.

*455 Q. Did he tell you that he was going to take off skin?
A. Not that I recall.
Q. And once again, if you had been told of the probability of an adverse cosmetic result, you would have had this operation any way?
A. No, I wouldn't.
Q. Although you testified in your deposition in May of 1987?
A. In '87, yes.
Q. All right, sir. And you were under oath then?
A. Yes.
. . . .
REDIRECT EXAMINATION
By Mr. Floyd.
Q. Mr. Walker has just referred again to your opinion in 1987 that if you would have known of, hypothetically, of adverse cosmetic results, that you would have hadyou testified that you would have had the surgery any way?
A. Yes, sir.
Q. Was that your opinion in '87?
A. Yes, sir.
Q. But that is not your opinion today?
A. That is not my opinion today.
After careful review of the record through the close of plaintiff's case we conclude that the trial court was not clearly wrong in determining that plaintiff had not met his burden of proving lack of informed consent because even in spite of the allegedly deficient consent plaintiff admitted that at the time of the surgery he would have undergone the procedure anyway despite the possibility of an unfavorable cosmetic result. Thus, there can be no recovery under this theory. See, LaCaze v. Collier, 434 So.2d 1039 (La.1983); Distefano v. Bell, 544 So.2d 567 (La.App. 1st Cir.), writ denied, 550 So.2d 650 (La.1989).
Accordingly the judgment of the trial court is affirmed. Costs are assessed against appellant.
AFFIRMED.