734 So.2d 835 (1999)
David CAPEL, et al., Plaintiffs Appellants,
v.
Dr. Donald LANGFORD, Defendant Appellee.
No. 98-1517.
Court of Appeal of Louisiana, Third Circuit.
April 28, 1999.
Rehearings Denied June 9 and June 15, 1999.
*837 Keitha Anne Leonard, Lafayette, R. Ray Orrill, Jr., Robert F. Shearman, New Orleans, Leslie A. Cordell, Lafayette, Gay Lyn McDaniel Curlin, New Orleans, Kevin D. Shearman, Metairie, for David Cappell, et al.
James R. Shelton, Lafayette, for Dr. Donald Langford, et al.
BEFORE: YELVERTON, WOODARD, and GREMILLION, Judges.
WOODARD, Judge.
This is a medical malpractice case. Ms. Mona Capel died eighteen months after undergoing surgical procedures, which included a gastrojejunostomy and a vagotomy, performed by Dr. Donald Langford, when a perforated ulcer developed near the site of the junction of her intestine and her stomach and led to her death. Ms. Capel's husband, Mr. David Capel, and her two sons by another marriage, Mr. Troy Romero and Mr. Timothy Romero, filed suit against Dr. Langford, Dr. Nathan Landry, and Hamilton Medical Center Hospital. Ultimately, Dr. Landry and Hamilton Medical Center Hospital were dismissed from the suit, and the case was tried before a jury against Dr. Langford. The jury returned a verdict for the defendant on all issues. The plaintiffs appeal the trial court's decision. We affirm in part and reverse in part.

FACTS
In August of 1990, Ms. Capel began to suffer from abdominal pain and vomiting. She was then forty years old. When her symptoms persisted for more than a week, her family physician, Dr. Landry, a family practitioner, admitted her to the Hamilton Medical Center Hospital to run tests. She remained in the hospital until September 17, 1990. Dr. Landry consulted with a number of specialists, among them, Dr. Donald Langford, a general surgeon; Dr. James Bienvenu, a gastroenterologist; Dr. Maximo Lamarche, a nephrologist; Dr. Gary Guidry, a pulmonologist; and Dr. Brian Barnes, an oncologist/hematologist. A number of laboratory and x-ray studies were performed during her admission, including an ultrasound of the gallbladder, an upper GI series, and a hepato-biliary scan. The various specialists determined that she might be suffering from some sort of kidney problem, possible gallbladder disease and some sort of pancreatic problem, which caused her potassium level to drop very low. Upon her discharge, the diagnosis was pancreatitis, possibly from gallstones, pneumonia, and possible kidney disease. However, her condition had improved and her electrolytes, *838 especially potassium, had returned to a normal level.
After her discharge, she continued to see Dr. Landry as an outpatient. Her condition began to deteriorate again. She experienced a significant weight loss, and her potassium level decreased to the point that it was potentially life threatening. Dr. Landry scheduled an appointment with Dr. Richard Schmidt, a gastroenterologist, for November 26, 1990. However, on the evening of November 25, 1990, she became so ill that she had to report to the emergency room at Hamilton Medical Center Hospital. Either she, or her family, called Dr. Langford and asked him to meet her at the emergency room, which he did. Dr. Langford advised the Capels that he would agree to be her physician only if he would be in charge of directing the care and making decisions as to what consultations would be necessary. The Capels agreed. Dr. Langford had Mr. Capel call Dr. Schmidt's office and cancel the appointment scheduled for the next day.
Dr. Langford discovered that her complaints had worsened since her admission to the hospital. He ordered laboratory studies and imaging studies which found her potassium level extremely low. The ultra sound of the gallbladder was repeated, along with the hepato-biliary scan. The results were consistent with gallbladder disease. An upper GI series was repeated on November 26, 1990, and a significant change was noted. The radiologist interpreted the film as consistent with superior mesenteric artery syndrome (SMAS). This is a very rare condition that occurs when the superior mesenteric artery is thought to compress the duodenum so much that it causes a significant obstruction and prohibits the stomach's contents from passing through the duodenum into the jejunum. As a result of the obstruction, the duodenum becomes dilated and the duodenal contents back up into the stomach causing gastric dilatations.
On the morning of November 27, 1990, Dr. Langford spoke with the radiologist and reviewed the upper GI series that concluded SMAS might be present. During that day, Dr. Langford conducted a literature search of SMAS to confirm that there was not any additional information about this condition. He had treated three or four cases of SMAS in his past years of medical practice.
Dr. Langford made the determination that surgery would be necessary. He believed that she was suffering from a gallbladder disease that was probably causing a pancreatic problem. At approximately 1:00 a.m. on the morning of November 28, 1990, Dr. Langford went to her room and woke Ms. Capel and her husband to discuss all the laboratory studies and x-rays that had been done. Dr. Langford explained in detail that gallbladder surgery would be necessary and that she possibly had SMAS, which would need surgical treatment, and used the x-rays to explain her medical situation. He offered her an opportunity to answer any questions she might have. At this time, he did not request that Ms. Capel give her written consent to the operation but left the room to give her and her husband time to think about the possible surgery. Immediately following this conversation, Dr. Langford made entries on her chart of a long discussion with the patient and her husband and ordered the coming surgical procedures for the nurse, which included a cholecystectomy (gallbladder surgery), exploratory laparotomy, gastroenterostomy (a re-routing of the intestinal tract by making a second opening in the stomach and connecting it directly to the small intestine known as the jejunum), placement of a subclavian line, operative cholangiogram, CBDE and vagotomy (severing of the nerves that control most of the acid production in the stomach). He prepared a consent form listing these procedures and left it with the chart with instructions for the nurse to have the consent form signed. This was the standard procedure in the *839 hospital at this time. This consent form was lost or misplaced.
At 5:30 a.m., nurse Doris Chaney, knowing that the consent form Dr. Langford had mentioned in his orders at 1:00 a.m. was not with the chart, prepared another consent form. She asked the Capels what operations were going to be preformed and she prepared the form, listing only the cholecystectomy and exploratory laparotomy. Mr. Capel signed the form for his wife at his wife's direction. Dr. Langford did not find out that his consent form had not been signed until he was being deposed for this case.
At 7:00 a.m., the patient was taken to surgery, and Dr. Langford performed the following surgeries: exploratory laparotomy, cholecystectomy, gastrojejunostomy, vagotomy, appendectomy, wedge biopsy of left lobe of the liver, and placement of a right subclavian catheter. Following surgery, Dr. Langford explained these procedures to the patient's family.
Postoperatively, Ms. Capel did fine. The hospital discharged her on December 9, 1990. Dr. Langford examined her on her first postoperative visit on December 17, 1990. At that point, her laboratory studies appeared fine. She continued treatment with her family physician, Dr. Landry. She did well for a couple of months and then began to have problems with nausea and vomiting. She was referred to Dr. Langford. He saw her on March 18, 1991. While she complained of vomiting, Dr. Langford noted that her appearance seemed excellent at that time. He ordered an upper GI series for her. This study was done on an outpatient basis on March 21, 1991. The results established that the gastrojejunostomy was working as planned. Following this visit, Dr. Langford had no further contact with the patient.
In April of 1991, Dr. Landry readmitted Ms. Capel to Hamilton Medical Center Hospital for a two-day stay because of weakness. Following her discharge from the hospital, she continued to see Dr. Landry for various problems until December of 1991, when Dr. Landry felt her symptoms required hospitalization. She was sent to Hamilton Medical Center Hospital on December 18, 1991 for admission. The hospital would not admit her without a large deposit, as the bills from the previous hospitalization remained unpaid. When advised of this fact, Dr. Landry suggested that she should come back to his office for some work that could be done on an outpatient basis.
Despite Dr. Landry's efforts, Ms. Capel did not return to his office until February 12, 1992. He recommended immediate hospitalization. Because she did not have insurance, she would not go. Dr. Landry recommended that she be admitted to the University Medical Center, but she refused and decided to wait nine days until her insurance would go into effect.
A few minutes after midnight on February 21, 1992, Ms. Capel was taken to Our Lady of Lourdes Hospital and admitted. Dr. Landry began treating her there. Dr. Langford was not on the staff at this hospital and was not involved in her care, nor consulted. Two days after her admission, her condition seriously deteriorated. Dr. Kenneth LaBorde, a general surgeon, was consulted because diagnostic studies indicated that she had a perforated ulcer. Dr. LaBorde operated on her on February 23, 1992. He found an ulcer at the site of the anastomosis which Dr. Langford had made. The ruptured ulcer resulted in the spilling of her bowel contents into her abdomen infecting her blood and all of her organs. In spite of the surgery, her condition continued to deteriorate. Ultimately, she went into a coma and died.
The medical testimony established that had she been admitted on February 12, 1992, as Dr. Landry had recommended, her chances for recovery would have been much greater, as the ulcer had not perforated by that time, and it might have been treated with medication.
*840 Ms. Capel's husband and her two sons filed a claim against Dr. Landry, Dr. Langford, and Hamilton Medical Center Hospital in Lafayette Parish. Dr. Landry and Hamilton Medical Center Hospital were dismissed from the suit prior to trial. A jury trial was conducted from February 3-11, 1998. The jury found for the defendant, Dr. Langford. The judgment was signed on March 11, 1998. The plaintiffs filed a motion for judgment notwithstanding the verdict, or in the alternative a new trial. Both were denied on April 3, 1998. The plaintiffs appeal devolutively.

ASSIGNMENTS OF ERROR
Appellants allege that the jury committed manifest error by failing to:
1. Find that the defendant performed one or more surgeries upon Ms. Capel without her consent;
2. Find that the defendant neglected to obtain the plaintiffs informed consent to perform one or more of the surgeries upon Ms. Capel;
3. Find that, had the defendant appropriately explained the surgeries, the benefits, the risks, and the alternative treatments to the plaintiffs, a reasonable person in Ms. Capel's position would have declined to undergo one or more of the surgeries;
4. Find that any of the surgical procedures performed without the plaintiffs' consent caused or contributed to Ms. Capel's suffering and/or death;
5. Find that the defendant was negligent in his diagnosis and treatment of Ms. Capel;
6. Find that the negligence of the defendant caused or contributed to Ms. Capel's suffering and/or death;
Appellants assert that the jury committed manifest error in finding:
7. Ms. Capel failed to follow the recommendation of her treating physician which caused and/or led to her death;
8. Ms. Capel was 100% at fault; and
9. The plaintiffs were not entitled to an award of damages.
10. Last, appellants allege that the trial court committed manifest error by refusing to allow its rebuttal expert to explain his answers, or to give the basis for his opinions.

LAW
As all but the last assignment of error allege that certain findings of the jury were clearly wrong or manifestly erroneous, the legal standards which we must apply to the first nine assignments of error are found in Johnson v. Lake Charles Memorial Hospital, 96-1178 (La.App. 3 Cir. 3/5/97); 692 So.2d 514, 516-17, writ denied, 97-891 (La.5/9/97); 693 So.2d 760. We stated:
This court may not set aside the jury's findings of fact in the absence of manifest error or unless those findings are clearly wrong, and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review. Rosell v. ESCO, 549 So.2d 840 (La.1989). Where there are two permissible views of the evidence, the factfinder's choice between these views cannot be manifestly erroneous. Id. Credibility calls are the function and prerogative of the trial court. Bruno v. Harbert Intern. Inc. 593 So.2d 357 (La.1992). An appellate court must review the record in its entirety to determine whether the findings of the trier of fact are clearly wrong or manifestly erroneous. Stobart v. State, Department of Transportation and Development, 617 So.2d 880 (La. 1993).
. . . .
This court stated in Charpentier v. Lammico Ins. Co., 606 So.2d 83, 85 (La. App. 3 Cir.1992):

*841 The law does not require perfection in medical diagnoses and treatment. On the contrary, a doctor's professional judgment and conduct must be evaluated in terms of reasonableness under the then existing circumstances, not in terms of results or in light of subsequent events. Broadway v. St. Paul Insurance Co., 582 So.2d 1368 (La.App. 2d Cir.1991), and the cases cited therein. When the alleged negligence of a specialist is at issue, only those qualified in that specialty may offer expert testimony and evidence of the applicable standard of care. Fox v. Our Lady of Lourdes Regional Medical Center, 550 So.2d 379 (La. App. 3rd Cir.1989), writs denied, 556 So.2d 1263 and 556 So.2d 1264 (La. 1990). When the expert opinions contradict concerning compliance with the applicable standard of care, the trial court's conclusions on this issue will be granted great deference. It is the sole province of the factfinder to evaluate the credibility of such experts and their testimony. Arceneaux, supra[, Charpentier v. Lammico Ins. Co., 606 So.2d 83, 85 (La.App. 3 Cir. 1992)]; Broadway, supra.
Now we turn to the assignments of error to which these standards apply.

ASSIGNMENTS OF ERROR NUMBERS 1 AND 2
As these assignments of error are factually related, we will discuss them together. These assignments of error concern whether or not, the jury[1] committed manifest error in not finding that Dr. Langford performed surgeries upon Ms. Capel without her consent.
The jury answered the relevant questions for this issue as follows:
1. Do you find, by 10 or more jurors, that other than making an incision in Mrs. Capel's abdomen to examine its organs ("exploratory laparotomy") and removing her gallbladder ("cholecystectomy"), Dr. Langford performed one or more additional surgical procedures upon Mona Capel without first obtaining her informed consent in the manner required, as the Court has instructed you?
Number of jurors voting yes: 2
Number of jurors voting no: 11
Dr. Langford performed seven surgical procedures upon Ms. Capel: a cholecystectomy, an exploratory laparotomy, an appendectomy, the insertion of a subclavian line, a liver wedge biopsy, a gastrojejunostomy, and a vagotomy. The plaintiffs contend that Ms. Capel did not give her consent, either verbally or in writing, to the appendectomy, the insertion of a subclavian line, the liver wedge biopsy, the gastrojejunostomy, or the vagotomy. At trial, the parties seriously contested this issue, and each party's proof presented the jury with facts that supported its position from which the jury chose to reach its decision.
Dr. Langford testified that at 1:00 a.m. on November 28, 1990, he went to the patient's room to discuss the proposed operative procedures with Ms. Capel and her husband; that he took the patient's x-rays with him, laid them out on her bed, and after waking the patient and her husband, discussed in detail her medical condition regarding the x-rays by holding the x-rays up to the light in the room and explaining her conditions to both of them; that the Capels understood what he was saying, asked numerous questions concerning the proposed procedures, which he answered; that he did not have them sign the consent form at that time, as he wanted to give them an opportunity to discuss the matter among themselves, and if they had any questions, they could be answered prior to the 7:00 a.m. surgery.
*842 After his discussion with the Capels, he immediately made entries on Ms. Capel's Progress Notes. The November 28, 1990, 1:00 a.m. Progress Note stated that all was ready for surgery in the morning and that a long discussion with the patient and her husband had taken place at that time. Dr. Langford then wrote his orders, titled "Physician's Orders," in Ms. Capel's chart at the same time included in the orders for Ms. Capel were: Wednesday surgery schedule, placement of right subclavian line, exploratory laparotomy, cholecystectomy, operative cholangiogram, possible CBDE, vagotomy, and gastroenterostomy. The orders specifically instructed the nurse to have the attached consent form signed. Dr. Langford testified that he prepares his own consent forms, did so in this case, and attached it to Ms. Capel's chart. This form was never signed and was possibly lost by the hospital staff. Dr. Langford was unaware that the consent form which he prepared was never executed by Ms. Capel until after this litigation began. Dr. Langford should have verified it before performing surgery. It was his duty alone to do so. La.R.S. 40:1299.40; Kelley v. Kitahama, 96-45 (La.App. 5 Cir. 5/15/96); 675 So.2d 1181, writ denied, 96-1555 (La.9/27/96); 679 So.2d 1352.
Mr. Capel and Ms. Capel's mother, Ms. Mildred Trahan, testified that at the 1:00 a.m. meeting with Dr. Langford, he never discussed the possibility of an appendectomy, the insertion of a subclavian line, the liver wedge biopsy, the gastrojejunostomy, or the vagotomy. They testified that only the cholecystectomy (gallbladder surgery) and the exploratory laparotomy were discussed, so the doctor could look at her pancreas. Mr. Capel testified that his wife was scared, but that Dr. Langford assured her that this was a routine operation, following which she could lead a normal life.
Mr. Capel testified that at 6:00 a.m. on the morning of the surgery, Nurse Chaney came into the patient's room to get the patient's written consent to the surgery and that she asked them to describe the surgery. He relayed that the doctor was going to remove her gallbladder and check her pancreas and ducts from the gallbladder to the pancreas. The nurse wrote on the consent form a cholecystectomy and an exploratory laparotomy, and he signed it for his wife.
The consent form was introduced into evidence as Defense Exhibit 3. In addition to the operative procedures listed, the form contained the following sentence: "I further authorize the doctors to perform any other procedure that in their judgment is necessary for my well being. Alternate methods of treatment, if any, have been explained to me, as have the advantages and disadvantages of each."
Nurse Chaney testified that even though Dr. Langford had written in the chart to have the patient sign "the attached consent," there was no consent form with the chart; that she and the charge nurse went through the patient's chart several times and could not find the consent form; and that pursuant to the hospital's policy, she took a consent form to the patient's room at 6:00 a.m. and asked the plaintiffs what the doctor told them he was going to do during surgery. She testified that the Capels told her that the doctor was going to do gallbladder surgery and an exploratory. She testified that it was the hospital's policy, when the doctor does not obtain consent himself, for the nurse to write on the consent form only what the patient understands is going to be performed. She asked them if the doctor told them anything else, and she testified that they said no.
After the patient's husband signed the consent form, Nurse Chaney placed it in front of the chart, and the patient was sent to the holding area for surgery, where everything was to be checked again, including the consent form by the doctor so he could sign it. Dr. Langford testified he did not review the new consent form before performing surgery. Nurse Chaney *843 testified that there was a conflict between Dr. Langford's order and what she had obtained from the Capels on the consent form, but she did not inform Dr. Langford of the conflict.
The Medical Review Panel's opinion was introduced into evidence concerning this issue. It opined that Dr. Langford held a discussion with the plaintiff and her husband concerning the proposed surgery and the diagnosis for her conditions.
There is no requirement that a patient's consent be written, and it may indeed be verbal, assuming it meets the established criteria. La.R.S. 40:1299(C); Descant v. Administrators of Tulane Educ. Fund, 95-2127 (La.App. 4 Cir. 1/21/98); 706 So.2d 618, writ denied, 98-467 (La.4/3/98); 717 So.2d 1131; Whiddon v. Elliott, 594 So.2d 449 (La.App. 1 Cir. 1991). However, Dr. Langford testified that he did not get Ms. Capel's verbal consent at the 1:00 a.m. meeting.
We are left with the question of the legal effect of the written consent form later signed at 6:00 a.m. Did it comply with the requirements of La.R.S. 40:1299.40(A)? It listed only a cholecystectomy and an exploratory laparotomy. Five more procedures actually performed did not appear on the form. These were the appendectomy, the insertion of a subclavian line, the liver wedge biopsy, the gastrojejunostomy, and the vagotomy. While the record reflects that the jury believed that Dr. Langford verbally discussed with the couple, at the 1:00 a.m. meeting, all the proposed procedures except the liver wedge biopsy, Dr. Langford did not secure Ms. Capel's verbal consent at that time. The only evidence of informed consent upon which we may rely is the written consent form signed at 6:00 a.m., which is incomplete as to five of the proposed procedures and did not contain the signature of the patient. A valid consent to medical treatment must meet the statutory standards of either La. R.S. 40:1299.40(A) or La.R.S. 40:1299.40(C). Thus, we find that the jury was clearly wrong in determining that the procedures not listed on the written consent form were consented to by Ms. Capel in accordance with La.R.S. 40:1299.40(A).
The question we must now decide concerns the legal effect of these deficiencies. In Lugenbuhl v. Dowling, 96-1575, p. 12 (La.10/10/97); 701 So.2d 447, 454, the supreme court instructs us that a plaintiff must prove more than a failure of consent in order to recover damages:
The plaintiff in a lack of informed consent case must prove not only that the physician failed to disclose all material information, but also that there was a causal relationship between the doctor's failure and the damages claimed by the patient. LaCaze, 434 So.2d at 1048. Otherwise, the doctor's conduct, however wrongful, is legally inconsequential. Id.

There are two aspects to the proof of causation in a lack of informed consent case. First, the plaintiff must prove, as in any other tort action, that the defendant's breach of duty was a cause-in-fact of the claimed damages or, viewed conversely, that the defendant's proper performance of his or her duty would have prevented the damages. Second, the plaintiff must further prove that a reasonable patient in the plaintiff's position would not have consented to the treatment or procedure, had the material information and risks been disclosed. LaCaze, 434 So.2d at 1048; Hondroulis, 553 So.2d at 412; Canterbury v. Spence, 464 F.2d 772, 790 (D.C.Cir.1972). Causation is established only if adequate disclosure reasonably would be expected to have caused a reasonable person to decline treatment because of the disclosure of the risk or danger that resulted in the injury. Canterbury, 464 F.2d at 791. Although the patient has the absolute right, for whatever reason, to prevent unauthorized intrusions and treatments, he or she can only recover damages for those intrusions in which consent would have been reasonably withheld if the *844 patient had been adequately informed. LaCaze, 434 So.2d at 1049.
(Emphasis added.)
Ms. Capel cannot meet her burden of proof to recover damages for the incomplete and deficient written consent form unless we conclude that the jury's finding, that a reasonable person in her situation would have consented to the surgery, is clearly wrong. See our discussion in assignment of error number three below.

Assignment of Error NUMBER 3
This assignment of error concerns whether the jury committed manifest error in finding that a reasonable person in Ms. Capel's situation would have consented to the surgery following Dr. Langford's explanation to her of her medical situation.
The jury answered the relevant question for this issue as follows:
2. Assuming Dr. Langford had appropriately explained each of these additional surgeries, the benefits of the surgeries and the risks of the surgeries, together with the benefits and risks of any alternative treatments, do you find that a reasonable person, in Mona Capel's situation and with her knowledge, would have declined to undergo any one or more of the surgeries?
Number of jurors voting yes: 1
Number of jurors voting no: 12
As discussed above, the jury heard the testimony of Dr. Langford as to the discussion he had with the Capels at 1:00 a.m. on the morning of November 28, 1990, which was corroborated in the Doctor's Progress Notes and Orders that he prepared shortly after his discussion with them. He testified that he discussed the various risks of the procedures and alternative treatments with the patient, and that he answered any questions the Capels had about the upcoming surgery.
Given the history of the patient's medical condition, which was before the jury, the jury reached the conclusion that a reasonable person in her situation would have consented to the surgery as happened here. Following our review of the entire record, we cannot say that the jury's finding on this issue was manifestly erroneous or clearly wrong.
This assignment of error is without merit, thus, Ms. Capel's estate is not entitled to recover damages for a failure of consent.

ASSIGNMENT OF ERROR NUMBER 4
In this assignment of error, the appellants contend that the jury's decision is manifestly erroneous in finding that Dr. Langford's surgical procedures did not cause or contribute to Ms. Capel's suffering or death.
The jury answered the relevant question for this issue as follows:
3. If your answer, by 10 or more jurors, was "yes" to question 1, do you find that any one or more of the surgical procedures performed without Mona Capel's consent caused or contributed to her subsequent suffering and/or death?
Number of jurors voting yes: 0
Number of jurors voting no: 13
In this assignment of error, the plaintiffs, relying on the testimony of their expert witness, Dr. Chester Semel, contend that Dr. Langford should have never operated on the patient even to perform the cholecystectomy. Dr. Semel based his opinion on the fact that at the time the diagnostic studies were done, the patient's potassium level was low and that gave false information regarding those tests. He testified that it was very inappropriate and below the standard of care to rush the patient into surgery for a situation like this where everything pointed to the problem not being related to the gallbladder but to a metabolic disturbance of the potassium. Dr. Semel also testified that the patient needed further diagnostic testing to identify the real problem.
*845 Other doctors, even those who testified for the plaintiffs, stated that the cholecystectomy was appropriate. Dr. LaBorde testified that he would have performed a cholecystectomy. Dr. Donald Reed, a family practitioner who served on the Medical Review Panel, testified that the cholecystectomy was appropriate, given the information that he reviewed.
Dr. Langford's expert witnesses; Dr. George Smith, a general surgeon who served on the Medical Review Panel, testified it would have been inappropriate not to have removed the patient's gallbladder; Dr. Weston Miller, another general surgeon who served on the Medical Review Panel, testified that Dr. Langford gave appropriate care, in all respects, to the patient.
Medical evidence from the gallbladder ultrasound done on November 26, 1990 showed a grossly distended gallbladder. The hepato-biliary scan done during this admission showed a non-visualizing gallbladder. The pathology report on the gallbladder showed a chronic cholecystitis. All of this evidence indicates a diseased gallbladder.
Having reviewed the entire record, the jury's factual finding on this issue was not manifestly erroneous or clearly wrong. This assignment of error is without merit.

ASSIGNMENTS OF ERROR NUMBERS 5 AND 6
In these assignments of error, the appellants contend that the jury decision that Dr. Langford was not negligent in his diagnosis and treatment of Ms. Capel and did not cause her death is manifestly erroneous.
The jury answered the relevant questions for this issue as follows:
4. Do you find, by 10 or more jurors, that the Defendant, Dr. Donald Langford, was negligent in his diagnosis or treatment of the Plaintiff, Mona Capel?
Number of jurors voting yes: 2
Number of jurors voting no: 11
5. Do you find, by 10 or more jurors, that the negligence of Dr. Langford caused or contributed to any injuries suffered by or the death of Mona Capel?
Number of jurors voting yes: 0
Number of jurors voting no: 13
The plaintiff's expert witness, Dr. Semel, testified that such a diagnosis is only made after an x-ray study of the stomach; that only about 400 cases have ever been reported in the worldwide medical literature since the syndrome was first described in the 1840's; that some people do not believe it exists; that there were at least 100 different causes for this patient's complaints, that SMAS would be at the bottom of the list; and that it was a breach of the standard of care for Dr. Langford not to do a differential diagnosis and rule out the patient's complaints first.
Contrary to this opinion, Dr. Langford's expert witness, Dr. Smith stated that, in his opinion, Dr. Langford reached a reasonable conclusion in his diagnosis of SMAS, and Dr. Miller testified that the patient did have SMAS.
Dr. Langford explained how he reached the diagnosis. When he received the upper GI series report on November 26, 1990, he found that the radiologist's impression was SMAS without significant obstruction. The report stated that, at the time of the fluoroscopy, there were minimal dilatations with some back and forth motion of the contract at the level of the proximal transverse or third portion of the duodenum, which is characteristic of the syndrome. The next day, Dr. Langford spoke with the radiologist to review his results and then conducted a review of the medical literature concerning SMAS. Dr. Langford introduced medical literature which established that the testing was consistent with SMAS, as were the patient's symptoms. However, a definitive diagnosis could not be made until he operated on the patient.
*846 Dr. Langford said that, after opening the patient's abdomen, he found a tight band where the superior mesenteric artery crossed the duodenum, which is consistent with SMAS. The plaintiff's expert, Dr. Semel, countered that such a diagnosis could not be made in the manner in which Dr. Langford did so. However, Dr. Langford's medical literature established that the findings that he made have been made in other cases this way.
Also, the plaintiffs contend that even if SMAS existed, then Dr. Langford performed the incorrect surgery. Their expert, Dr. Semel, testified that six to eight of his patients with SMAS required surgery; that, in those cases, he did the same procedure that Dr. Langford did; that a gastrojejunostomy, as Dr. Langford performed, is one of the procedures which could be done if surgery is required to treat the SMAS; that it was not below the standard of care to do a gastrojejunostomy if, in fact, the patient needed the surgery; and that if a gastrojejunostomy were done, then a vagotomy should be done at the same time. He opined that Dr. Langford properly performed the vagotomy; however, he opined that there were better operations that could have been done and that it was below the standard of care to do the procedure that Dr. Langford chose to do.
Another one of plaintiff's expert witnesses, Dr. LaBorde, maintained that he had never seen a case of SMAS and had never heard of a gastrojejunostomy being done for SMAS; and that based upon this patient and her condition, he would not have considered performing a gastrojejunostomy upon her.
Dr. Smith testified that Dr. Langford's choice of surgery was acceptable and that, frequently, the choice of surgery must be made on the operating table based upon the anatomy and other factors.
Dr. Miller testified that he had seen fifteen to twenty cases of SMAS and that the vast majority of the cases required surgery. He explained that the basic operation is to bypass the obstruction and that the procedure chosen by Dr. Langford was one of the acceptable surgeries and that the gastrojejunostomy was an appropriate procedure in this case. Accordingly, Dr. Langford introduced medical literature to the jury that established that a gastrojejunostomy with vagotomy is one of the acceptable procedures for addressing SMAS.
Evidence before the jury regarding the necessity of surgery, the diagnosis of SMAS, and the choice of surgical procedure chosen by Dr. Langford, was conflicting. Both sides presented credible evidence and qualified experts to discuss the diagnosis and treatment. The jury chose to believe the testimony of the defendant's case. Having reviewed the entire record, we cannot say that the jury's finding was manifestly erroneous or clearly wrong.
This assignment of error is without merit.

ASSIGNMENTS OF ERROR NUMBERS 7 AND 8
In these assignments of error, the appellants contend that the jury's decision that Ms. Capel failed to follow Dr. Landry's recommendation, resulting in her death, and that she was one hundred percent at fault were manifestly erroneous.
The jury answered the relevant questions for this issue as follows:

6. Do you find, by 10 or more jurors, that Mona
 Capel failed to follow the recommendations of her
 treating physician, which caused or contributed to
 her injuries and/or her death?
 Number of jurors voting yes: 13
 Number of jurors voting no: 0
7. a) Please assign a percentage of fault to
 Dr. Donald Langford; 0%
 --
 b) Please assign a percentage of fault to
 Mona Capel. 100%
 ____
 (Must equal 100%) 100%

The evidence in the record establishes that on February 12, 1992, the patient returned to see Dr. Landry, her family physician. Dr. Landry testified that during her February 12, 1992 visit, he recommended that she be hospitalized. She refused because she did not have any hospitalization insurance. He testified that he recommended that she be admitted to the University Medical Center as *847 that would not require insurance, and she again refused. She was admitted to Our Lady of Lourdes Hospital on February 21, 1992, nine days after Dr. Landry's recommendation for hospitalization.
Dr. LaBorde testified that when he performed surgery on her on February 23, 1990, he found a perforated ulcer and that it probably perforated one or two days before surgery, likely the day she came to the hospital. He opined that treatment or surgery before the ulcer perforated would have given her a much better chance of surviving. This testimony was not contradicted.
Dr. Miller testified that the x-rays revealed that the patient's ulcer had not yet perforated when she was admitted to the hospital on February 21, 1992.
The evidence in the record supports the jury's finding on this issue. This assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER 9
In this assignment of error, the appellants contend that the jury's decision not to award damages was manifestly erroneous. As this issue was not briefed by the appellant, pursuant to the Uniform Rules of the Courts of Appeal Rule 2-12.4, we consider the issue abandoned.

ASSIGNMENT OF ERROR NUMBER 10
In this assignment, the appellants urge that the trial court abused its discretion and erred by refusing to allow their rebuttal expert to explain his answers or to give the basis for his opinions.
On January 30, 1998, three days before the trial was to begin on February 3, 1998, the plaintiffs' counsel identified to the defendant's counsel an expert witness, a general surgeon and a lawyer, Dr. William Walker, whom he intended to call as a witness. The witness lists for the trial had been filed, and the plaintiffs had not listed Dr. Walker on theirs.
During the trial, Dr. Walker helped the plaintiffs' counsel select jury members and prepare questions to propound to the witnesses. At the close of the defendant's case, the plaintiffs informed the court that they wished to call Dr. Walker as a rebuttal witness. The defendant's counsel objected to his being allowed to testify at all because of the plaintiffs' failure to disclose the witness in a timely manner which would have permitted the defense to depose him. The trial court overruled the objection and offered the defense counsel twenty-four or forty-eight hours to depose Dr. Walker. The defendant's counsel rejected this offer, contending that the jury was ready to get this case. The trial court then reviewed a list of questions and proposed answers, which plaintiffs' counsel proffered to him, concerning the proposed subjects for Dr. Walker's rebuttal testimony. From this proffer, the trial court identified those matters to which Dr. Walker would be permitted to testify, accepting some questions and rejecting others, and limiting Dr. Walker's testimony to answer the approved questions with only a "yes" or "no" answer. He was not permitted to explain his opinions in response to the approved questions. The plaintiffs contend that the trial court rendered Dr. Walker's rebuttal testimony useless and that they were unfairly prejudiced by its restrictions on his testimony.
A trial court has great discretion in controlling the presentation of evidence, including the power to admit or refuse to admit rebuttal evidence. LeBlanc v. Continental Grain Co., Inc. 95-813 (La.App. 5 Cir. 3/13/96); 672 So.2d 951, writ denied, 96-1526 (La.10/4/96); 679 So.2d 1383. Rebuttal evidence is to be confined to new matters adduced by the defense and is not to be a repetition of the plaintiff's case. Bordelon v. Drake, 578 So.2d 1174 (La.App. 5 Cir.1991); Combs v. Hartford Ins. Co., 544 So.2d 583 (La.App. 1 Cir.), writ denied, 550 So.2d 630 (La. 1989).
The question we have before us is whether or not the trial court abused its great discretion in limiting the rebuttal testimony of Dr. Walker. We have carefully *848 reviewed the plaintiffs' proffered testimony, the trial court's reasons for the exercise of discretion in this matter, and Dr. Walker's testimony. We do not find that the trial court abused its discretion, especially given the late hour in which plaintiffs disclosed their intent to use Dr. Walker as a witness.
It is obvious that the plaintiffs' counsel was aware of Dr. Walker at some time prior to the trial and made the tactical decision not to disclose his name to the defense until three days before trial, gambling that the trial court would permit him to testify as they desired in rebuttal. The law requires that the scope of rebuttal be limited to those matters adduced by the defense under the careful control of the trial court as was properly done in this case.
This assignment of error is without merit.

CONCLUSION
The jury's decisions regarding assignments of error one and two were manifestly erroneous. Those findings are reversed; however, no damages may be awarded. The jury's decisions regarding assignments of error three through nine were not manifestly erroneous or clearly wrong. The trial court did not abuse its discretion in limiting Dr. Walker's rebuttal testimony. Those findings are affirmed. The parties are equally cast with the costs of this appeal.
AFFIRMED IN PART AND REVERSED IN PART.
NOTES
[1] At the beginning of the trial, the parties stipulated that the jury would consist of thirteen jurors and that three less than the total number would be necessary for a verdict. This was acceptable to the trial court.